JINA L. CHOI (N.Y. Bar No. 154425)
ERIN E. SCHNEIDER (Cal. Bar No. 216114)
    schneiders@sec.gov
SUSAN F. LA MARCA (Cal. Bar No. 215231)
    lamarcas@sec.gov
ROBERT TASHJIAN (Cal. Bar No. 191007)
    tashjianr@sec.gov
JUDITH L. ANDERSON (Cal. Bar No. 124281)
    andersonju@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, 28th Floor
San Francisco, California  94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL F. KARA,<br><br>Defendant. | Case No. 3:09-cv-1880-EMC<br><br>DECLARATION OF JUDITH L. ANDERSON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AGAINST MICHAEL KARA<br><br><br>February 4, 2016, 1:30 p.m.<br>Honorable Edward M. Chen<br>Courtroom 5, 17th Floor |

I, Judith L. Anderson, declare:

1.  I am an attorney employed by the Securities and Exchange Commission ("Commission") in its San Francisco Regional Office.  I am one of the attorneys at the Commission responsible for this case and am familiar with the files and records herein.  I submit this declaration in support of the Commission's Motion for Summary Judgment against defendant Michael Kara.  Unless otherwise specified, I have personal knowledge of the facts stated herein, and could and would testify competently to them if called to do so.

2.  For the Court's convenience, attached are true and correct copies of certain documents filed in the present case:

    a.  Attached as Exhibit A is the Amended Complaint filed in this action on October 30, 2009, *SEC v. Kara*, No. 3:09-cv-1880 EMC SEC Case, ECF No. 62.

    b.  Attached as Exhibit B is the Final Judgment as to Emile Jilwan, dated January 6, 2012, ECF No. 99.

3.  As an attorney at the Commission, I am familiar with the Commission's EDGAR system, including the following explanatory statement on the Commission's website at http://www.sec.gov/edgar/aboutedgar.htm:  "EDGAR, the Electronic Data Gathering, Analysis, and Retrieval system, performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the . . . Commission."

4.  I searched the Commission's website for documents pertaining to the acquisition of Andrx Corporation in March 2006 by clicking on the Filings tab and then the Company Filings Search tab.  On the Company name search page, I typed in "Andrx."  By scrolling through the search results and the archived listings, I found and downloaded a copy of Form 8-K filed by Andrx on March 13, 2006 and the attached Press Release,.  A true and correct copy of this document is attached as Exhibit C, and is also available on the SEC's website at:

http://www.sec.gov/Archives/edgar/data/1123337/000095014406002121/g00176e8vk.htm

ANDERSON DEC. ISO SEC'S MOTION FOR SUMMARY JUDGMENT
SEC v. KARA
CASE NO. 3:09-CV-1880-EMC

5. I searched the Commission's website for documents pertaining to the acquisition and tender offer for Biosite, Inc. in March 2007 by clicking on the Filings tab and then the Company Filings Search tab. On the Company name search page, I typed in "Biosite." The search yielded two results, one of which was Alere San Diego, Inc., formerly Biosite, Inc. By scrolling down the archived listings, I found and downloaded copies of the documents listed below, true and correct copies of which are attached:

    a. Attached as Exhibit D is a true and correct copy of Schedule TO-C for Biosite Incorporated, filed by Beckman Coulter, Inc., on March 26, 2007, which is also available on the SEC's website at:

        http://www.sec.gov/Archives/edgar/data/1123337/000095014406002121/g00176e8vk.htmch.

    b. Attached as Exhibit E is a true and correct copy of Form 8-K filed by Biosite Incorporated, attaching a Press Release dated March 25, 2007, which is also available on the SEC's website at:

        http://www.sec.gov/Archives/edgar/data/840467/000119312507064371/d8k.htm

6. In the course of my work on this case, I reviewed case records, including the transcripts of testimony taken by other members of the Commission staff during the investigation that preceded the filing of this action. Among these transcripts was the transcript of the Testimony of Michael Kara, taken under oath on August 1, 2008, in the Commission's investigation, In the Matter of Trading in the Securities of United Surgical Partners International, Inc., and Biosite, Inc., SF-03247. Attached hereto as Exhibit F is a true and correct copy of that transcript.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on December 21, 2015, in San Francisco, California.


             __/s/ Judith L. Anderson_____
             Judith Anderson

# EXHIBIT A

1   MARC J. FAGEL (Cal. Bar No. 154425)
    ROBERT TASHJIAN (Cal. Bar No. 191007)
2       tashjianr@sec.gov
    MARK P. FICKES (Cal. Bar No. 178570)
3       fickesm@sec.gov
    LLOYD FARNHAM (Cal. Bar No. 202231)
4       farnhaml@sec.gov

5
    Attorneys for Plaintiff
6   SECURITIES AND EXCHANGE COMMISSION
    44 Montgomery Street, 26th Floor
7   San Francisco, California  94104
    Telephone:  (415) 705-2500
8   Facsimile:  (415) 705-2501

9

10                      UNITED STATES DISTRICT COURT

11                    NORTHERN DISTRICT OF CALIFORNIA

12                        SAN FRANCISCO DIVISION

13

14  SECURITIES AND EXCHANGE COMMISSION,      Case No. CV 09-1880 MHP

15              Plaintiff,

16          v.
                                             AMENDED COMPLAINT
17  MAHER F. KARA,
    MICHAEL F. KARA,
18  EMILE Y. JILWAN,
    ZAHI T. HADDAD,
19  BASSAM Y. SALMAN, and
    KARIM I. BAYYOUK,
20
                Defendants.
21

22

23  Plaintiff Securities and Exchange Commission (the "Commission") alleges:

24                        **SUMMARY OF THE ACTION**

25          1.      This action involves a long-running scheme to capitalize on inside information

26  misappropriated by a former employee of the Investment Banking Division of Citigroup Global

27  Markets, Inc. ("Citigroup").  From at least April 2004 until April 2007, Maher Kara, an

28  investment banker specializing in the healthcare industry, tipped his brother Michael Kara with

material nonpublic information about upcoming deals involving healthcare companies. Michael Kara traded stock and options based on these tips, and passed tips on to his friends and family members. Michael Kara made more than $1.5 million from the scheme, and those he tipped made more than $4.5 million.

2.     The participants in the scheme hit big payoffs on at least two occasions. In February 2006, Maher Kara tipped Michael Kara about a plan to acquire drug-maker Andrx Corporation. Michael Kara bought Andrx stock and options, spending more than $150,000 on these securities in the three weeks before the public announcement that Andrx would be acquired. Following the March 13, 2006 announcement, these trades earned profits of nearly $400,000. Michael Kara also tipped his uncle, two friends, and Maher Kara's brother-in-law, and trading by these tippees and others they tipped earned profits of $750,000.

3.     Second, in March 2007, Maher Kara tipped his brother about an upcoming acquisition involving Biosite, Inc., a medical device company. Three days before the acquisition was announced, Michael Kara began buying stock and options, spending more than $150,000. While amassing Biosite securities in his own accounts, Michael Kara also tipped friends and family, and traded in other people's online brokerage accounts. The trades in Michael Kara's own account resulted in profits of $1.2 million, while his trades in other people's accounts made profits of more than $2.3 million. Other traders tipped by Michael Kara made profits of more than $1.3 million.

4.     Maher Kara learned of the nonpublic information regarding the planned acquisitions because investment bankers in his group were working on the deals, and he illegally misappropriated the information in violation of Citigroup policy and the explicit promises he had made to keep confidential any information he learned in the course of his employment. Michael Kara was aware that the tips he received from Maher Kara were inside information Maher Kara learned through his work at Citigroup. Michael Kara's tippees named as Defendants in this action were aware of the scheme, and were aware that the information provided to them by Michael Kara originated from Maher Kara.

AMENDED COMPLAINT

## JURISDICTION AND VENUE

5.     The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1].

6.     This Court has jurisdiction over this action pursuant to Sections 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa].

7.     Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

8.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial part of the acts and transactions constituting the violations alleged in this Complaint occurred within the Northern District of California, and because one or more Defendant resides or transacts business in the district.

## INTRADISTRICT ASSIGNMENT

9.     Under Civil Local Rule 3-2, this civil action should be assigned to the San Francisco or Oakland Divisions, because a substantial part of the events or omissions which give rise to the claim occurred in Alameda County and Contra Costa County.

## DEFENDANTS

10.     **Maher Kara**, age 37, is a resident of San Carlos, California. He is a former employee of Citigroup Global Markets, Inc., most recently holding the title Director in the Healthcare Group in Citigroup's Investment Banking Division. He left Citigroup's employment in April 2007, joining another investment bank. In sworn testimony during the Commission investigation Maher Kara invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding the allegations in this complaint.

11.     **Michael Kara**, age 48, is a resident of Walnut Creek, California. He is Maher Kara's brother and is a self-employed consultant regarding environmental clean-up and remediation projects. In sworn testimony during the Commission investigation Michael Kara invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding the allegations in this complaint.

AMENDED COMPLAINT

12.     **Emile Jilwan**, age 54, is a resident of Pleasanton, California.  Jilwan is a friend of Michael Kara and is employed as a civil engineer by a regional transit agency.  In sworn testimony during the Commission investigation Jilwan invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding the allegations in this complaint.

13.     **Zahi Haddad**, age 54, is a resident of Stockton, California.  Haddad is the uncle of Michael Kara and Maher Kara, and operates a car rental agency in Stockton.

14.     **Bassam Salman**, age 49, is a resident of Orland Park, Illinois.  Salman is the brother of Maher Kara's wife.  Salman is the general manager of a restaurant supply distribution company and a business partner of Karim Bayyouk.  In sworn testimony during the Commission investigation Salman invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding the allegations in this complaint.

15.     **Karim Bayyouk**, age 44, is a resident of Livonia, Michigan.  His wife and Bassam Salman's wife are sisters.  Bayyouk owns several restaurants in and around Detroit, Michigan and is a business partner of Bassam Salman.  In sworn testimony during the Commission investigation Bayyouk invoked his Fifth Amendment right against self-incrimination and refused to answer questions regarding the allegations in this complaint.

<div align="center">**OTHER RELEVANT PERSONS**</div>

16.     **Joseph N. Azar**, age 49, is a resident of Pleasanton, California.

17.     **Nasser N. Mardini**, age 52, is a resident of Stockton, California.

<div align="center">**RELEVANT ACQUISITION TARGETS**</div>

18.     **Biosite, Inc.** ("Biosite") was a Delaware corporation with its principal place of business in San Diego, California.  During the relevant time period, Biosite common stock was listed on the NASDAQ Global Market.  Prior to its acquisition in 2007, Biosite developed and sold diagnostic medical tests.

19.     **Andrx Corporation** ("Andrx") was a Delaware corporation with its principal place of business in Davie, Florida.  During the relevant time period, Andrx common stock was

listed on the NASDAQ National Market System.  Prior to its acquisition in 2006, Andrx was a pharmaceutical company specializing in generic drugs.

## FACTUAL ALLEGATIONS

### A.    Maher Kara's access to nonpublic information

20.    Maher Kara was employed by Citigroup as an investment banker from 1998 to April 2007.  Starting in 2002, Maher Kara began specializing in healthcare companies, and in 2004 relocated from California to Citigroup's headquarters in New York City.  In 2005, Maher Kara was promoted to the title of Director in the Healthcare Group of Citigroup's Investment Banking Division.  Maher Kara and other investment bankers in the Healthcare Group worked on a variety of engagements for companies in healthcare-related industries, including advising companies in possible mergers and acquisitions, assisting companies with raising funds through loans, debt offerings, and stock sales, and advising companies negotiating deals to license pharmaceutical products and other technology.

21.    Maher Kara learned about confidential upcoming transactions and other confidential information regarding Citigroup's clients through his position in the Healthcare Group, including discussions with his colleagues in the group, formal and informal exchanges of information between investment bankers in the group, and directly advising Citigroup clients.

22.    In order to perform their job duties effectively, employees within the Healthcare Group collaborated and shared information regarding their client relationships and pending projects on behalf of clients or potential clients.  To the extent necessary to represent their clients, managers in the Healthcare Group encouraged confidential discussion within the group to share ideas, utilize collective experience and industry knowledge, and to prevent potential conflicts of interest, redundant efforts, or contradictory efforts within the group.

23.    During the relevant time period, senior bankers within the Healthcare Group, including Maher Kara, discussed pending projects and other aspects of their work at a biweekly meeting.  Citigroup bankers discussing their work within the group knew that each person in the group was subject to confidentiality obligations that would prevent the misuse or further dissemination of the information.

24. As an employee of Citigroup with access to confidential information, Maher Kara knew that he was subject to restrictions regarding confidential information he obtained in the course of his employment. All Citigroup employees with access to confidential information received training on the confidentiality restrictions, both when beginning employment and at regular intervals. Maher Kara was also subject to Citigroup policies that prohibited him from trading in securities issued by any healthcare company.

25. These policies placed a duty on Maher Kara to maintain the confidentiality of any information he obtained in the course of his employment. For example, Citigroup policies state that Citigroup employees who have received confidential information from any source are "strictly prohibited from using or disseminating that information except as necessary to perform . . . legitimate job responsibilities." Citigroup policies also prohibit the use of material, nonpublic information regarding any security issued by a publicly traded company, including prohibiting "conveying such information to anyone."

**B. Trading in the securities of Andrx Corporation**

**1. Maher Kara learns that Andrx is a takeover target**

26. In December 2005, an international drug company engaged Citigroup's Investment Banking Division to advise the company in negotiations to acquire Andrx Corporation, a pharmaceutical company based in Florida. The drug company's planned acquisition of Andrx and its engagement of Citigroup was confidential and not publicly disclosed.

27. Maher Kara was aware that Citigroup's client was actively seeking to acquire Andrx based on his work in the Citigroup Investment Banking Healthcare Group, including communications with other Citigroup employees, conversations with his colleagues in the group, discussions at meetings, and the close working relationship he had with investment bankers and other employees in the group. Starting on December 29, 2005, Maher Kara was included on e-mail messages regarding the engagement and was aware of the planned deal. On January 11, 2006, Maher Kara received an e-mail describing the Citigroup client's "imminent bid for Andrx." On January 12, 2006, a Citigroup banker sent an e-mail to Maher Kara and other

1  bankers in the Healthcare Group instructing that they use confidential "code names" for the

2  proposed deal, describing the Citigroup client's financing needs, and anticipating that the

3  Citigroup client would acquire Andrx in a tender offer.

4      28.    Citigroup bankers participated in conducting due diligence of the target company,

5  preparing a fairness opinion on the offering price and other deal terms, and obtaining financing

6  to fund the acquisition.  On February 7, 2006, Citigroup's client sent a letter to Andrx formally

7  proposing the acquisition.  By February 24, 2007, Citigroup's client had taken the following

8  steps toward an acquisition of Andrx, including (1) engaging legal and financial advisors; (2)

9  negotiating with Andrx management and board of directors regarding an offer price; (3) making

10  a formal written offer to acquire Andrx; and (4) securing financing commitments for the

11  proposed acquisition.

12      29.    On Sunday, March 12, 2006, the Andrx board of directors voted to reject the

13  acquisition offer made by Citigroup's client, instead accepting a competing acquisition offer

14  from Watson Pharmaceuticals, Inc.  The agreement between Andrx and Watson Pharmaceuticals

15  was publicly announced on Monday, March 13, 2006.  After the acquisition was announced,

16  Andrx stock closed on March 13 at $23.73 per share, an increase of 10 percent from the $21.59

17  closing price on Friday, March 10.

18          **2.**    **Maher Kara tips his brother, who trades and tips others**

19      30.    On or before February 24, 2006, Maher Kara misappropriated material nonpublic

20  information, in breach of his duty of confidentiality to Citigroup, by tipping his brother Michael

21  Kara about the planned Andrx acquisition.  Maher Kara tipped Michael Kara to confer a benefit

22  on himself or to provide a gift to his brother.

23      31.    On February 24, 2006, Michael Kara made his first trades in Andrx securities, and

24  that day spent $92,735 purchasing short-term call options.  A call option is a security, traded on

25  national options exchanges, that gives the holder the right to purchase shares of stock of a

26  company at a set price, or strike price, on the date the option expires.  The value of a call option

27  varies based on the price of the underlying stock price, and increases if the stock price rises

28  above the strike price.  From February 24 to March 10, Michael Kara spent a total of $150,675

1   purchasing Andrx call options.  He also purchased 735 shares of Andrx stock at a cost of

2   $14,722.  His trading resulted in illegal profits of $396,315 after the public announcement of the

3   acquisition of Andrx.

4       32.    Michael Kara also tipped friends and family about the plan to acquire Andrx to

5   confer a benefit on himself or to provide a gift to his friends and family.

6       33.    On February 24, 2006, the same day he purchased Andrx call options in his own

7   account, Michael Kara tipped his friend Emile Jilwan with material nonpublic information

8   regarding Andrx.  Jilwan began acquiring Andrx call options, his first Andrx trades.  From

9   February 24 through March 10, 2006, Jilwan spent $157,629 to purchase short-term Andrx call

10  options.  Jilwan's Andrx trading resulted in illegal profits of $386,010 after the public

11  announcement of the acquisition of Andrx.

12      34.    On February 24, 2006, Michael Kara tipped Bassam Salman with material

13  nonpublic information regarding Andrx.  The same day, Salman tipped his business partner and

14  wife's brother-in-law, Karim Bayyouk, to confer a benefit on himself or to provide a gift to

15  Bayyouk.  On February 24, 2006, Bayyouk made his first trades in Andrx securities.  From

16  February 24, 2006 to March 10, 2006, Bayyouk spent $322,292 purchasing Andrx call options

17  while in the possession of material nonpublic information regarding Andrx.  Bayyouk's trading

18  resulted in illegal profits of $363,418 after the public announcement regarding Andrx.

19      35.    On or before March 6, 2006, Michael Kara tipped his friend Joseph Azar with

20  material nonpublic information regarding Andrx.  On March 6, 2006, Azar made his first

21  purchase of Andrx securities, purchasing 2,500 shares of Andrx stock, spending more than

22  $123,000 on the trades.  Azar's Andrx trading resulted in potential profits of $18,473 after the

23  acquisition was publicly announced.

24      36.    On or before March 9, 2006, Michael Kara tipped his uncle Zahi Haddad with

25  material nonpublic information regarding Andrx.  Haddad purchased Andrx options based on a

26  recommendation from Michael Kara.  On March 9, 2006, Haddad liquidated all other holdings in

27  his brokerage account and spent $11,349 to purchase short-term Andrx call options.  Haddad's

28  Andrx trading resulted in illegal profits of $10,205 after the acquisition was publicly announced.

37.    By trading in Andrx securities based on information he received from Maher Kara, Michael Kara made illegal profits of $396,315, while the friends and family he tipped made illegal profits totaling $778,106.

38.    The following diagram summarizes the above allegations regarding trading in Andrx stock and options:



39.    At the time that each of the Defendants tipped others or purchased Andrx stock or options, each Defendant was in possession of material nonpublic information regarding Andrx, and each knew or was reckless in not knowing that the information had been disclosed in breach of a duty of confidentiality.  At the time that the Defendants tipped others or purchased Andrx stock or options, each Defendant knew or had reason to know that the information they possessed regarding Andrx was nonpublic, and knew or had reason to know the information was acquired directly or indirectly from an offering company, the company to be acquired, or any officer, director, partner, or employee or any other person acting on behalf of the offering company or company to be acquired.

**C.    Trading in the Securities of Biosite, Inc.**

**1.    Maher Kara learns that Biosite is a takeover target**

40.    On March 5, 2007, bankers from Citigroup's Investment Banking Healthcare Group learned that one of its clients, Beckman Coulter Inc., a medical equipment company based

in Fullerton, California, was in advanced discussions with an acquisition target and would seek financing for the acquisition from Citigroup. By Friday, March 9, 2007, Citigroup investment bankers in the Healthcare Group knew that Beckman Coulter was negotiating to acquire Biosite, Inc., a medical device company based in San Diego, California.

41.     Over the next two weeks, lawyers and advisors for the companies negotiated the terms of an agreement under which Beckman Coulter would acquire Biosite through a tender offer. During this time, the negotiations between Beckman Coulter and Biosite regarding Beckman's planned acquisition, and Citigroup's involvement with the financing of the planned acquisition, were confidential and not publicly disclosed. Citigroup investment bankers analyzed the deal and obtained the internal approval for Citigroup's commitment to Beckman Coulter for financing of a portion of the funds necessary to complete the acquisition of Biosite. On March 19, 2007, the pending Biosite deal was discussed at a biweekly Citigroup meeting held in New York that all healthcare group employees, including Maher Kara, were expected to attend in person or by telephone.

42.     At least as of March 19, 2007, Beckman Coulter had taken the following steps toward its planned acquisition of Biosite, including (1) entering into a confidentiality agreement; (2) engaging legal and financial advisors; (3) negotiating with Biosite management and board of directors regarding a tender offer price; and (4) securing financing commitments for the proposed acquisition.

43.     Maher Kara learned material nonpublic information about the secret acquisition negotiations through Healthcare Group meetings, other meetings of investment bankers in the Healthcare Group, conversations with his colleagues in the Healthcare Group who knew about the pending acquisition, and through his close contact and working relationship with employees within the Citigroup Investment Banking Healthcare Group.

44.     On Sunday, March 25, 2007, Beckman Coulter announced that it had reached an agreement with the management of Biosite to acquire the company through a tender offer at a price of $85 per share. The price of Biosite shares rose 51 percent from a $55.45 closing price

1  on Friday, March 23 to close at $83.80 per share on Monday, March 26, with the trading volume

2  on March 26 more than 38 times the trading volume on March 23.

3  **2.    Maher Kara tips his brother, who trades and tips others**

4  45.    Maher Kara misappropriated material nonpublic information, in breach of his

5  duty of confidentiality to Citigroup, by tipping his brother Michael Kara about the planned

6  Biosite acquisition.  Maher Kara tipped Michael Kara to confer a benefit on himself or to provide

7  a gift to his brother.

8  46.    On March 22, 2007, Maher Kara placed two telephone calls from his office

9  telephone, at 12:44 p.m. and 12:49 p.m. Pacific Time, to Michael Kara's mobile phone.  Minutes

10  after the calls, Michael Kara placed an online order for 100 Biosite call option contracts that

11  expired the following month, his first trades in Biosite securities.  On March 22 and 23, 2007,

12  while in possession of material nonpublic information regarding Biosite, Michael Kara spent

13  $154,451 to purchase 1,615 shares of stock and 435 call option contracts in his own accounts, for

14  total illegal profits of $1,239,711.

15  47.    Michael Kara tipped friends and family about the plan to acquire Biosite.

16  Michael Kara provided the tips to receive a personal benefit or to confer a gift of the information

17  to his friends and family.

18  48.    At 1:23 p.m. Pacific Time on March 22, Michael Kara attempted to call his friend

19  Joseph Azar.  Michael Kara did not reach Azar, but they spoke later that afternoon.  During the

20  conversation Michael Kara provided Azar with material nonpublic information about the plan to

21  acquire Biosite.  On March 23, 2007, Azar purchased 3,700 shares of Biosite stock, spending

22  more than $200,000 on the trades.  Azar's Biosite trading resulted in potential profits of

23  $108,525 after the acquisition was publicly announced.

24  49.    At 1:24 p.m. Pacific Time on March 22, Michael Kara called Bassam Salman,

25  tipping him with material nonpublic information regarding Biosite.  Salman called Karim

26  Bayyouk less than 30 minutes later, tipping him with material nonpublic information regarding

27  Biosite for a personal benefit or to confer a gift of the information.  Beginning early the next

28  morning Bayyouk began purchasing Biosite call options, his first Biosite trades.  Bayyouk spent

1    $100,906 to purchase short-term call options while in the possession of material nonpublic

2    information regarding Biosite. Bayyouk made illegal profits of $954,905 after the Biosite

3    acquisition was announced.

4            50.     In addition to trading in his own account, Bayyouk tipped his brother with

5    material nonpublic information about the planned acquisition of Biosite. Bayyouk provided the

6    tip to receive a personal benefit or to confer a gift of the information to his brother. On

7    March 23, 2007, Bayyouk's brother spent $5,018 purchasing short-term Biosite call options, and

8    these trades resulted in profits of $72,550 after the acquisition was publicly announced.

9            51.     At 3:32 p.m. Pacific Time on March 22, Michael Kara called his friend Nasser

10   Mardini. During the conversation Michael Kara provided Mardini with material nonpublic

11   information about the planned acquisition of Biosite. On March 23, Mardini directed a friend to

12   place call options trades for his benefit, encouraged his brother to purchase Biosite call options,

13   and traded in another friend's account. The illegal profits in these accounts totaled $291,723.

14           52.     At 3:44 p.m. Pacific Time on March 22, Michael Kara and Emile Jilwan spoke by

15   telephone. Minutes later, Jilwan placed an order for Biosite call options, his first Biosite trades,

16   in a joint account held for the benefit of Jilwan and his wife. On March 22 and 23, Michael Kara

17   purchased Biosite stock and call options at a cost of $303,603 in a different brokerage account

18   held solely in Jilwan's name but to which Michael Kara had access. After the public

19   announcement of Beckman Coulter's agreement to acquire Biosite, the trades made in Jilwan's

20   accounts resulted in illegal profits of more than $2.3 million.

21           53.     The following morning, March 23 at 8:26 a.m. Pacific Time, Michael Kara called

22   his uncle Zahi Haddad. Within 30 minutes after the call, Haddad wired $2,100 into his

23   brokerage account, and later that day purchased Biosite call options, his first Biosite trades.

24   Haddad's trades resulted in illegal profits of $81,725.

25           54.     Also on March 23, Michael Kara placed two trades in an account held in the name

26   of a long-time friend of Michael Kara and his family. These trades resulted in illegal profits of

27   $118,235 after the Biosite announcement.

28

55.     By trading in Biosite securities based on information he received from Maher Kara, Michael Kara made illegal profits in his accounts of more than $1.2 million, while his friends and family he tipped and their tippees made illegal profits totaling more than $3.9 million.

56.     The following diagram summarizes the above allegations regarding trading in Biosite stock and options:

**Maher Kara**
**New York, NY**
- Investment banker in Citigroup's healthcare group
- Colleagues in his group worked on Biosite deal

**Michael Kara**
**Walnut Creek, CA**
- Profits: $1.2 Million
- Telephone call with Maher Kara 3/22/07, first trade minutes later

**Emile Jilwan**
**Pleasanton, CA**
- Profits: $2.3 Million
- Telephone call with Michael Kara 3/22/07, first trade minutes later

**Bassam Salman**
**Orland Park, IL**
- Telephone call with Michael Kara 3/22/07, minutes later Salman calls Karim Bayyouk

**Karim Bayyouk**
**Livonia, MI**
- Profits: $955,000
- Telephone call with Bassam Salman 3/22/07, first trade 3/23/07

**Zahi Haddad**
**Stockton, CA**
- Profits: $82,000
- Telephone call with Michael Kara on 3/23/07, first trade 3/23/07

**Nasser Mardini**
**Stockton, CA**
- Telephone call with Michael Kara 3/22/07
- Trades and encourages others to trade 3/23/07

**Joseph Azar**
**Pleasanton, CA**
- Profits: $108,000
- Telephone call with Michael 3/22/07, first trade 3/23/07

57.     At the time that each of the Defendants tipped others or purchased Biosite stock or options, each Defendant was in possession of material nonpublic information regarding Biosite, and each knew or was reckless in not knowing that the information had been disclosed in breach of a duty of confidentiality.  In addition, Jilwan knew or was reckless in not knowing that trades made by Michael Kara in his accounts were based on material nonpublic information obtained in breach of a duty of confidentiality.  At the time that the Defendants tipped others or purchased Biosite stock or options, each Defendant knew or had reason to know that the

AMENDED COMPLAINT

1    information they possessed regarding Biosite was nonpublic, and knew or had reason to know

2    the information was acquired directly or indirectly from an offering company, the company to be

3    acquired, or any officer, director, partner, or employee or any other person acting on behalf of

4    the offering company or company to be acquired.

5              **D.      The Scheme to Profit from Illegal Trading**

6              58.     Although the trading related to Andrx and Biosite securities was the most

7    profitable trading in the Defendants' insider trading scheme, these trades were part of a recurring

8    patterns of misappropriation and illegal trading on material nonpublic information.  Using

9    information misappropriated from Citigroup, Michael Kara traded in companies with pending

10   projects or meetings involving Maher Kara's group within Citigroup at least 20 times from 2004

11   to 2007.  In February 2007, Michael Kara wrote a check for $250,000 to his brother Maher Kara

12   drawn on funds transferred from the brokerage account that held the proceeds of Michael Kara's

13   illegal trading.

14             59.     Michael Kara, together with Emile Jilwan, engaged in an extensive pattern of

15   trading that closely tracked investment banking activities within the Healthcare Group at

16   Citigroup during a three-year period.  Beginning in April 2004 or earlier, Michael Kara and

17   Jilwan traded in the securities of companies that were either parties to potential transactions

18   involving Citigroup's Investment Banking Healthcare Group or had interactions with Maher

19   Kara or other investment bankers in the group.  In some cases Maher Kara's friends and

20   colleagues worked on transactions, and in other cases Maher Kara worked directly on possible

21   transactions or attended meetings with senior management of companies later traded by his

22   brother.  The trading, timed with events and information known within Citigroup's Healthcare

23   Group, continued through at least April 2007.

24             60.     One example of the trading related to the scheme to share nonpublic information

25   involved the stock of a pharmaceutical company based in Illinois ("Company A").  On

26   January 29, 2004, Citigroup was engaged to advise an international pharmaceutical company in a

27   potential acquisition of Company A.  Company A's engagement of Citigroup and the potential

28   acquisition were confidential and not publicly disclosed.  Citigroup continued to work on the

potential transaction through August 2004. Maher Kara was aware of the transaction at least by

April 6, 2004. Beginning on April 21, 2004, Michael Kara and Emile Jilwan purchased

Company A call options. Karim Bayyouk also purchased Company A call options beginning of

May 6, 2005. The contemplated acquisition did not take place, and the potential acquisition was

not publicly announced.

61. A second example of trading related to the scheme involved the stock of a

pharmaceutical company based in Pennsylvania ("Company B"). On June 13, 2005, Citigroup

investment bankers were engaged to advise Company B regarding its negotiations with another

public company seeking to acquire Company B. Company B's engagement of Citigroup and the

potential acquisition were confidential and not publicly disclosed. Maher Kara was on the team

of bankers advising Company B. Beginning on June 21, 2005, Michael Kara purchased

Company B call options. Bayyouk also purchased Company B call options beginning on June

21, 2005. The acquisition agreement was never finalized and the potential acquisition was not

publicly announced.

62. A third example of trading related to the scheme involved the stock of a

healthcare services company ("Company C"). Beginning on about January 23, 2006,

Company C retained Citigroup's Investment Banking Division as an advisor regarding a

potential hostile takeover bid the company expected to receive from a competing company.

Company C's engagement of Citigroup and the potential takeover bid were confidential and not

publicly disclosed. Maher Kara was aware of the engagement at least as of January 30, 2006.

On February 2, 2006, Michael Kara began purchasing Company C call options. The takeover

bid was not successful, and the potential acquisition was not publicly announced.

63. Throughout the course of the insider trading scheme, Michael Kara traded for his

own benefit and tipped other family members and friends with confidential information he

learned from Maher Kara. Zahi Haddad, Michael Kara's uncle, traded in the securities of at least

eight companies including Andrx and Biosite based on tips provided by Michael Kara from

January 2006 to March 2007. Haddad knew that Maher Kara worked on mergers and

1   acquisitions as an investment banker specializing in the healthcare industry and that his work
2   involved confidential information.

3         64.    Bassam Salman also participated in the scheme, and received stock tips from
4   Michael Kara and passed these tips to Karim Bayyouk, his business partner and wife's brother-
5   in-law.  Bayyouk traded in the securities of at least 14 companies including Andrx and Biosite
6   that correspond to Michael Kara's trades in the securities of those companies.  Salman received a
7   portion of the proceeds of Bayyouk's illegal trades.  Salman knew Maher Kara worked as an
8   investment banker for Citigroup and that he specialized in healthcare companies.

9   <div align="center">**FIRST CLAIM FOR RELIEF**</div>

10   <div align="center">*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 by All Defendants*</div>

11         65.    Paragraph nos. 1 through 64 are re-alleged and incorporated herein by reference.

12         66.    Defendant Maher Kara misappropriated material nonpublic information he
13   learned in the course his employment with Citigroup to tip Defendant Michael Kara, in breach of
14   duties of confidentiality and trust that Maher Kara owed to Citigroup or Citigroup's clients.

15         67.    Each Defendant, while in the possession of material nonpublic information
16   regarding Andrx and Biosite, traded in the securities of those companies or tipped others using
17   material nonpublic information.

18         68.    Each Defendant knew or was reckless in not knowing that the information he used
19   to tip others or that he possessed at the time of the trading was obtained through the breach of a
20   duty of confidentiality or trust.

21         69.    Each Defendant that tipped others with material nonpublic information received a
22   benefit, either financial, reputational, or social, from the tips provided to others.

23         70.    Each Defendant, with scienter, directly or indirectly (a) employed devices,
24   schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a
25   material fact necessary in order to make the statements made, in the light of the circumstances
26   under which they were made, not misleading; and (c) engaged in acts, practices, or courses of
27   business which operated or would operate as a fraud or deceit upon other persons, in connection

28

1  with the purchase or sale of securities, by the use of means or instrumentalities of interstate

2  commerce, of the mails, or the facilities of a national securities exchange.

3       71.    Based on the above conduct and the factual allegations contained in this

4  Complaint, Defendants violated, and unless restrained and enjoined will continue to violate,

5  Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

6  § 240.10b-5].

7  <center>**SECOND CLAIM FOR RELIEF**</center>

8  <center>*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 by All Defendants*</center>

9       72.    Paragraph nos. 1 through 64 are re-alleged and incorporated herein by reference.

10       73.    On or before February 24, 2006, offering entities or persons had taken a

11  substantial step or steps to commence, or had commenced, a tender offer for securities of Andrx.

12  On or before March 22, 2007, offering entities or persons had taken a substantial step or steps to

13  commence, or had commenced, a tender offer for securities of Biosite.

14       74.    Each Defendant was in possession of material information relating to such tender

15  offers, which information he knew or had reason to know was nonpublic, and which information

16  he knew or had reason to know had been acquired directly or indirectly from (1) the offering

17  entity or person; (2) the issuer of the securities to be sought by such tender offer; or (3) any

18  officer, director, partner, employee or any other person acting on behalf of the offering entity or

19  person or the issuer.  While in possession of this material nonpublic information relating to such

20  tender offers, each Defendant purchased, sold, or caused to be purchased or sold, securities of

21  Andrx and Biosite.

22       75.    Defendants Maher Kara, Michael Kara, Bassam Salman, and Karim Bayyouk

23  were in possession of material nonpublic information relating to such tender offers, which

24  information each knew or had reason to know had been acquired directly of indirectly from (1)

25  the offering entity or person, or its officers, directors, partners, employees or advisors; (2) the

26  issuer of the securities to be sought by such tender offer or its officers, directors, partners,

27  employees or advisors; or (3) anyone acting on behalf of the entities or persons described in (1)

28  or (2).  Defendants Maher Kara, Michael Kara, Bassam Salman, and Karim Bayyouk

<center>17</center>

1   communicated material nonpublic information relating to such tender offers under circumstances

2   in which it was reasonably foreseeable that such communications was likely to result in a

3   violation of Rule 14e-3.

4       76.     Based on the above conduct and the factual allegations contained in this

5   Complaint, each Defendant violated, and unless restrained and enjoined will continue to violate,

6   Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R.

7   § 240.14e-3].

8                        **PRAYER FOR RELIEF**

9       WHEREFORE, the Commission respectfully requests that this Court:

10                                I.

11      Permanently enjoin Defendants from directly or indirectly violating Sections 10(b) and

12  14(e) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78n(e)], and Rules 10b-5 and 14e-3

13  thereunder [17 C.F.R. §§ 240.10b-5 and 240.14e-3].

14                                II.

15      Order Defendants to disgorge the ill-gotten gains derived from their illegal trading and

16  tipping, plus prejudgment interest.

17                                III.

18      Order Defendants each to pay civil penalties pursuant to Section 21A of the Exchange

19  Act [15 U.S.C. § 78u-l]; and

20                                IV.

21      Grant such other relief as this Court may deem just and appropriate.

22

23  Dated:  October 30, 2009                  Respectfully submitted,

24

25                                */s/ Lloyd Farnham*
                                  _____
26                                LLOYD FARNHAM
                                  Attorney for Plaintiff
27                                SECURITIES AND EXCHANGE COMMISSION

28

# EXHIBIT B

1   MARC J. FAGEL (Cal. Bar No. 154425)
2   ROBERT TASHJIAN (Cal. Bar No. 191007)
       tashjianr@sec.gov
3   LLOYD FARNHAM (Cal. Bar No. 202231)
       farnhaml@sec.gov

4   Attorneys for Plaintiff
5   SECURITIES AND EXCHANGE COMMISSION
    44 Montgomery Street, 26th Floor
6   San Francisco, California 94104
    Telephone: 415-705-2500
7   Facsimile: 415-705-2501

8

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. CV 09-1880 EMC |
| Plaintiff, | [PROPOSED] |
| v. | FINAL JUDGMENT AS TO DEFENDANT EMILE Y. JILWAN |
| MAHER F. KARA, MICHAEL F. KARA, EMILE Y. JILWAN, BASSAM Y. SALMAN, and KARIM I. BAYYOUK, | |
| Defendants. | |

20

21          The Securities and Exchange Commission having filed a Complaint and Defendant

22   Emile Y. Jilwan having entered a general appearance; consented to the Court's jurisdiction over

23   Defendant and the subject matter of this action; consented to entry of this Final Judgment

24   without admitting or denying the allegations of the Complaint (except as to jurisdiction); waived

25   findings of fact and conclusions of law; and waived any right to appeal from this Final Judgment:

26                                          I.

27          IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant and

28   Defendant's agents, servants, employees, attorneys, and all persons in active concert or

participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

    (a)    to employ any device, scheme, or artifice to defraud;

    (b)    to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

## II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant and Defendant's agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise are permanently restrained and enjoined from violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 [17 C.F.R. § 240.14e-3] promulgated thereunder, in connection with any tender offer or request or invitation for tenders, from engaging in any fraudulent, deceptive, or manipulative act or practice, by:

    (a)    purchasing or selling or causing to be purchased or sold the securities sought or to be sought in such tender offer, securities convertible into or exchangeable for any such securities or any option or right to obtain or dispose of any of the foregoing securities while in possession of material information relating to such tender offer that Defendant knows or has reason to know is nonpublic and knows or has reason to know has been acquired directly or indirectly from the offering person; the issuer of the securities sought or to be sought by such tender offer; or any officer, director, partner, employee or other person acting on behalf of the

FINAL JUDGMENT AS TO
DEFENDANT EMILE Y. JILWAN

offering person of such issuer, unless within a reasonable time prior to any such purchase or sale such information and its source are publicly disclosed by press release or otherwise; or

(b)    communicating material, nonpublic information relating to a tender offer, which Defendant knows or has reason to know is nonpublic and knows or has reason to know has been acquired directly or indirectly from the offering person; the issuer of the securities sought or to be sought by such tender offer; or any officer, director, partner, employee, advisor, or other person acting on behalf of the offering person of such issuer, to any person under circumstances in which it is reasonably foreseeable that such communication is likely to result in the purchase or sale of securities in the manner described in subparagraph (a) above, except that this paragraph shall not apply to a communication made in good faith

    (i)    to the officers, directors, partners or employees of the offering person, to its advisors or to other persons, involved in the planning, financing, preparation or execution of such tender offer;

    (ii)    to the issuer whose securities are sought or to be sought by such tender offer, to its officers, directors, partners, employees or advisors or to other persons involved in the planning, financing, preparation or execution of the activities of the issuer with respect to such tender offer; or

    (iii)    to any person pursuant to a requirement of any statute or rule or regulation promulgated thereunder.

III.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is liable for disgorgement of $1,317,087, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $332,833, for a total of $1,649,920. Based on Defendant's sworn representations in his Statement of Financial Condition dated September 23, 2011, and other documents and information submitted to the Commission, however, the Court is not ordering Defendant to pay a civil penalty, and

FINAL JUDGMENT AS TO
DEFENDANT EMILE Y. JILWAN

1   payment of all but $330,000 of the disgorgement and prejudgment interest thereon is waived.

2   Defendant shall satisfy this obligation by paying $150,000 within 10 days of the entry of this

3   Final Judgment, and $180,000 within 90 days of the entry of this Final Judgment, by certified

4   check, bank cashier's check, or United States postal money order payable to the Securities and

5   Exchange Commission.  The payment shall be delivered or mailed to the Office of Financial

6   Management, Securities and Exchange Commission, Operations Center, 6432 General Green

7   Way, Mail Stop 0-3, Alexandria, Virginia 22312, and shall be accompanied by a letter

8   identifying Emile Y. Jilwan as a defendant in this action; setting forth the title and civil action

9   number of this action and the name of this Court; and specifying that payment is made pursuant

10  to this Final Judgment.  Defendant shall pay post-judgment interest on any delinquent amounts

11  pursuant to 28 USC § 1961.  The Commission shall remit the funds paid pursuant to this

12  paragraph to the United States Treasury.

13                                        VI.

14          If Defendant fails to make any payment by the date agreed and/or in the amount agreed

15  according to the schedule set forth above, all outstanding payments under this Final Judgment,

16  including post-judgment interest, minus any payments made, shall become due and payable

17  immediately without further application to the Court.

18                                        V.

19          The determination not to impose a civil penalty and to waive payment of all but $330,000

20  of the disgorgement and pre-judgment interest is contingent upon the accuracy and completeness

21  of Defendant's Statement of Financial Condition.  If at any time following the entry of this Final

22  Judgment the Commission obtains information indicating that Defendant's representations to the

23  Commission concerning his assets, income, liabilities, or net worth were fraudulent, misleading,

24  inaccurate, or incomplete in any material respect as of the time such representations were made,

25  the Commission may, at its sole discretion and without prior notice to Defendant, petition the

26  Court for an order requiring Defendant to pay the unpaid portion of the disgorgement, pre-

27  judgment and post-judgment interest thereon, and the maximum civil penalty allowable under

28  the law.  In connection with any such petition, the only issue shall be whether the financial

information provided by Defendant was fraudulent, misleading, inaccurate, or incomplete in any material respect as of the time such representations were made. In its petition, the Commission may move this Court to consider all available remedies, including, but not limited to, ordering Defendant to pay funds or assets, directing the forfeiture of any assets, or sanctions for contempt of this Final Judgment. The Commission may also request additional discovery. Defendant may not, by way of defense to such petition: (1) challenge the validity of the Consent or this Final Judgment; (2) contest the allegations in the Complaint filed by the Commission; (3) assert that payment of disgorgement, pre-judgment and post-judgment interest or a civil penalty should not be ordered; (4) contest the amount of disgorgement and pre-judgment and post-judgment interest; (5) contest the imposition of the maximum civil penalty allowable under the law; or (6) assert any defense to liability or remedy, including, but not limited to, any statute of limitations defense.

<div align="center">VI.</div>

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

<div align="center">VII.</div>

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

<div align="center">VIII.</div>

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

Dated: _____ 1/6/12

_____
Edward M. Chen
United States District Judge

IT IS SO ORDERED
Judge Edward M. Chen

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FINAL JUDGMENT AS TO
DEFENDANT EMILE Y. JILWAN

1

2 Approved as to form:

3

4 *William H. Green* Digitally signed by William Green
DN: cn=William Green, o, ou,
email=greenbill@pacbell.net,
c=US
Date: 2011.09.30 13:24:26 -07'00'

5 William H. Green, Esq.
2 Wanda Way

6 Martinez, CA  94553
Telephone:  (925) 890-6408

7 ATTORNEY FOR DEFENDANT EMILE Y. JILWAN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FINAL JUDGMENT AS TO
DEFENDANT EMILE Y. JILWAN

# EXHIBIT C

Andrx Corporation

8-K 1 g00176e8vk.htm ANDRX CORPORATION

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, DC 20549

# FORM 8-K

### CURRENT REPORT PURSUANT
### TO SECTION 13 OR 15(D) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of report (Date of earliest event reported) March 12, 2006

# Andrx Corporation

(Exact Name of Registrant as Specified in Its Charter)

Delaware

(State or Other Jurisdiction of Incorporation)

| 0-31475 | 65-1013859 |
|---|---|
| (Commission File Number) | (IRS Employer Identification No.) |

| 4955 Orange Drive, Davie, Florida | 33314 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

954-584-0300

(Registrant's Telephone Number, Including Area Code)

(Former Name or Former Address, if Changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☑ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Andrx Corporation

## TABLE OF CONTENTS

ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT
ITEM 3.03 MATERIAL MODIFICATION TO RIGHTS OF SECURITY HOLDERS
ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS.
SIGNATURES
Agreement and Plan of Merger
Amendment to Rights Agreement
Press Release

Table of Contents

## ITEM 1.01 ENTRY INTO A MATERIAL DEFINITIVE AGREEMENT

On March 12, 2006, Andrx Corporation (the "Company") entered into an agreement and plan of merger (the "Merger Agreement") with Watson Pharmaceuticals, Inc., a Nevada corporation ("Watson"), and Water Delaware, Inc., a Delaware corporation and a wholly owned subsidiary of Watson ("Merger Subsidiary"), providing for the merger of Merger Subsidiary with and into the Company (the "Merger"). Pursuant to the terms of the Merger Agreement and subject to the conditions thereof, Watson will acquire all of the outstanding shares of the Company's common stock ("Company common stock") (together with the right attached to each such share issued pursuant to the Company's Rights Agreement dated March 20, 2003 (the "Rights Agreement")) for an amount equal to $25.00 in cash per share. Each option to purchase Andrx common stock that is outstanding and unexercised immediately prior to the effective time of the merger shall be cancelled in exchange for the right to receive from Watson or the surviving corporation a lump sum cash payment (without interest) equal to the product of (x) the excess (if any) of (A) $25.00 over (B) the exercise price per share of Company common stock for such option and (y) the number of shares of Company common stock underlying such option, less applicable withholding taxes. In addition, each restricted stock unit that is outstanding immediately prior to the effective time of the Merger, shall be cancelled in exchange for the right to receive from Watson or the surviving corporation a lump sum cash payment (without interest) equal to the product of (x) $25.00 and (y) the number of shares of Company common stock underlying such restricted stock unit, less applicable withholding taxes.

The Board of Directors of the Company has unanimously approved the Merger Agreement. The Merger Agreement contains customary representations and warranties between the Company, on the one hand, and Watson and Merger Subsidiary, on the other. The parties also have agreed to certain customary covenants and agreements, including, with respect to the operation of the Company's business between signing and closing, the solicitation of proposals with respect to alternative transactions, governmental filings and approvals, employee benefits and similar matters.

The Merger Agreement contains certain termination rights for both the Company and Watson, and further provides that, upon termination of the Merger Agreement under specified circumstances, the Company may be required to pay Watson a termination fee of $70,769,000 as described in the Merger Agreement.

Consummation of the Merger is subject to the satisfaction of certain customary conditions including, among others, (i) approval of the Merger by the Company's stockholders, (ii) the expiration of the applicable waiting period under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Approval"), and (iii) no material adverse effect having occurred in respect of the Company, other than actions taken in connection with the HSR Approval, which must not have a material adverse effect on Watson on a post-Merger basis.

On March 13, 2005, Andrx issued a press release announcing the Merger. The full text of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K.

The foregoing description of the Merger and the Merger Agreement does not purport to be complete and is qualified in its entirety by reference to the Merger Agreement, which is filed as Exhibit 2.1 hereto, and is incorporated into this report by reference.

Table of Contents

**ITEM 3.03 MATERIAL MODIFICATION TO RIGHTS OF SECURITY HOLDERS**

Andrx has amended the Rights Agreement (the "Amendment") to provide that the rights issued to Andrx stockholders under the Rights Agreement, as amended, will not become exercisable as a result of the execution of the Merger Agreement or the consummation of the Merger, and that the rights will terminate upon the closing of the Merger.

The foregoing description of the the Amendment to the Rights Agreement is qualified in its entirety by reference to the full text of the the Amendment to the Rights Agreement, which has been filed as Exhibit 4.5 to this Current Report on Form 8-K.

On March 13, 2005, Andrx issued a press release announcing the Merger. The full text of the press release is attached as Exhibit 99.1 to this Current Report on Form 8-K.

**\* \* \* \* \*Additional Information and Where to Find It**

This filing may be deemed to be solicitation material in respect of the proposed merger of Watson and Andrx. In connection with the proposed merger, Andrx will file a proxy statement with the U.S. Securities and Exchange Commission (the "SEC"). INVESTORS AND SECURITY HOLDERS OF ANDRX ARE ADVISED TO READ THE PROXY STATEMENT AND ANY OTHER RELEVANT DOCUMENTS FILED WITH THE SEC WHEN THEY BECOME AVAILABLE BECAUSE THOSE DOCUMENTS WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED MERGER. The final proxy statement will be mailed to stockholders of Andrx. Investors and security holders may obtain a free copy of the proxy statement, when it becomes available, and other documents filed by Andrx with the SEC, at the SEC's web site at http://www.sec.gov. Free copies of the proxy statement, when it becomes available, and the company's other filings with the SEC may also be obtained from the company. Free copies of Andrx's filings may be obtained by directing a request to Andrx Corporation, 4955 Orange Drive, Davie, Florida 33314, Attention: Investor Relations.

**Participants in Solicitation**

Andrx, Watson and their respective directors, executive officers and other members of their management and employees may be deemed to be soliciting proxies from their respective stockholders in favor of the merger. Information regarding Watson's directors and executive officers is available in Watson's proxy statement for its 2005 annual meeting of stockholders, which was filed with the SEC on April 1, 2005. Information regarding Andrx's directors and executive officers is available in Andrx's proxy statement for its 2005 annual meeting of stockholders, while was filed with the SEC on April 19, 2005. Additional information regarding the interests of such potential participants will be included in the proxy statement and the other relevant documents filed with the SEC when they become available.

Andrx Corporation                                                                                    Page 6 of 7

Table of Contents

**ITEM 9.01. FINANCIAL STATEMENTS AND EXHIBITS.**

(c)  Exhibits:

| Exhibit No. | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger by and among Watson Pharmaceuticals, Inc., Water Delaware, Inc. and Andrx Corporation dated March 12, 2006. |
| 4.5 | Amendment to Rights Agreement dated as of March 12, 2006 between Andrx Corporation and American Stock Transfer & Trust Company. |
| 99.1 | Press Release dated March 13, 2006. |

<u>**Table of Contents**</u>

**SIGNATURES**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

<div align="center">

**ANDRX CORPORATION**

</div>

Date: March 13, 2006                          By:     /s/ Angelo C. Malahias
                                                      Angelo C. Malahias
                                                      President

EX-99.1 4 g00176exv99w1.htm PRESS RELEASE

Exhibit 99.1



## Andrx to be acquired by Watson for $25.00 Per Share

### *Total transaction valued at approximately $1.9 Billion*

**FORT LAUDERDALE, FLORIDA, March 13, 2006** — Andrx Corporation (Nasdaq: ADRX) and Watson Pharmaceuticals, Inc. (NYSE: WPI) announced today that they have signed a definitive merger agreement providing for the acquisition of Andrx by Watson. Under the terms of the agreement, Watson will acquire all of the outstanding shares of Andrx common stock for a cash amount of $25.00 per share. The transaction has a total indicated purchase price of approximately $1.9 billion. The Boards of Directors of both companies have unanimously approved the transaction.

Thomas P. Rice, Andrx's Chief Executive Officer, commented on the opportunity presented by the agreement. "This transaction provides excellent value to our shareholders while also opening new business avenues for Andrx in terms of geography, product offerings, and technologies. The combined assets, product portfolio, and capabilities of the two companies position us strongly for the highly competitive pharmaceutical market. Andrx's manufacturing, R&D, controlled-release technology, distribution network, and employees, in combination with Watson's excellent team and capabilities, create a significant vertically integrated company in the specialty pharmaceutical industry," said Mr. Rice.

Commenting on the transaction, Dr. Allen Chao, Watson's Chairman and Chief Executive Officer stated, "The Andrx transaction significantly supports our long-term goal of expanding our existing product portfolio and pipeline, while strengthening Watson's position in high value, specialized sustained-release technology. The combined revenue stream will fuel further product development and sales, while allowing Watson the flexibility and financial resources to continue building its specialty pharmaceutical business through internal product development and product in-licensing."

### Transaction Terms

Consummation of the merger is subject to the satisfaction of certain customary conditions including, among others, (i) approval of the merger by Andrx's stockholders, (ii) the expiration of the applicable waiting period under the Hart-Scott Rodino Antitrust Improvements Act of 1976, as amended, and (iii) no material adverse effect having occurred in respect of Andrx, subject to certain exceptions. Dates for closing the acquisition and for Andrx's stockholders' meeting to vote on the merger have not yet been determined. The price of $25.00 per share of Andrx stock represents a premium of approximately 32% to the average of the last 30 days' stock price.

Banc of America Securities LLC acted as financial advisor to Andrx in this transaction. The external legal counsel for Andrx was Proskauer Rose LLP and Sullivan & Cromwell LLP.

### Conference Call and Webcast Information

Watson and Andrx will host a webcast and conference call today at 4:00 p.m. Eastern Standard Time to discuss the transaction. To access the live webcast, go to Andrx's website at http://www.andrx.com and click on Investor Relations. The dial-in number to access the conference call is (877) 251-7980, or from international locations, (706) 643-1573. A taped replay of the call will be available by calling (800) 642-

1687 with access pass code 6548988. The replay may be accessed from international locations by dialing (706) 645-9291 and using the same pass code. This replay will remain in effect until midnight Eastern Standard Time on March 24, 2006.

**About Andrx**

Andrx Corporation is a pharmaceutical company that:

- develops and commercializes generic versions of primarily controlled-release pharmaceutical products, as well as oral contraceptives and selective immediate-release products;

- distributes pharmaceutical products, primarily generics, which have been commercialized by others, as well as our own, primarily to independent and chain pharmacies and physicians' offices; and

- develops and manufactures pharmaceutical products for other pharmaceutical companies, including combination products and controlled-release formulations.

This release and additional information about Andrx Corporation is also available on the Internet at: http://www.andrx.com.

**Cautionary Language Concerning Forward-Looking Statements**

Watson and Andrx have included in this press release financial estimates and other forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. These estimates and statements are subject to risks and uncertainties, and actual results might differ materially from these estimates and statements. Such estimates and statements include, but are not limited to, statements about the benefits of the merger, including future financial and operating results, the combined company's plans, objectives, expectations and intentions, and other statements that are not historical facts. Such statements are based upon the current beliefs and expectations of the management of Watson Pharmaceuticals, Inc. and Andrx Corporation and are subject to significant risks and uncertainties and outside of our control. The following factors, among others, could cause actual results to differ from those described in the forward-looking statements in this press release: the ability to obtain governmental approvals of the merger on the proposed terms and schedule; the failure of Andrx stockholders to approve the merger; the risk that the businesses of Watson and Andrx will not be integrated successfully or as quickly as expected; the risk that the cost savings and any other synergies from the merger, including any savings and other synergies may not be fully realized or may take longer to realize than expected; disruption from the merger making it more difficult to maintain relationships with customers, employees or suppliers; and competition and its effect on pricing, spending, third-party relationships and revenues. Additional factors that may affect future results are contained in Watson's and Andrx's filings with the Securities and Exchange Commission ("SEC"), which are available on Watson and Andrx's Web sites (www.watson.com) and (www.Andrx.com) respectively, or the SEC's Web site (www.sec.gov). Watson and Andrx are not under any obligation, and expressly disclaim any obligation, to update, alter or otherwise revise any forward-looking statement, whether written or oral, that may be made from time to time, whether as a result of new information, future events or otherwise.

**Additional Information and Where to Find It**

This press release may be deemed to be solicitation material in respect of the proposed merger of Watson and Andrx. In connection with the proposed merger, Andrx will file a proxy statement with the U.S. Securities and Exchange Commission (the "SEC"). INVESTORS AND SECURITY HOLDERS OF ANDRX ARE ADVISED TO READ THE PROXY STATEMENT AND ANY OTHER RELEVANT DOCUMENTS FILED WITH THE SEC WHEN THEY BECOME AVAILABLE BECAUSE THOSE DOCUMENTS WILL CONTAIN IMPORTANT INFORMATION ABOUT THE PROPOSED

Page 2

MERGER. The final proxy statement will be mailed to stockholders of Andrx. Investors and security holders may obtain a free copy of the proxy statement, when it becomes available, and other documents filed by Andrx with the SEC, at the SEC's web site at http://www.sec.gov. Free copies of the proxy statement, when it becomes available, and the company's other filings with the SEC may also be obtained from the company. Free copies of Andrx's filings may be obtained by directing a request to Andrx Corporation, 4955 Orange Drive, Davie, Florida 33314, Attention: Investor Relations.

**Participants in Solicitation**

Andrx and its directors, executive officers and other members of its management and employees may be deemed to be soliciting proxies from its stockholders in favor of the merger. Information regarding Andrx's directors and executive officers is available in Andrx's proxy statement for its 2005 annual meeting of stockholders, which was filed with the SEC on April 19, 2005. Additional information regarding the interests of such potential participants will be included in the proxy statement and the other relevant documents filed with the SEC when they become available.

<p align="center"># # #</p>

SOURCE: Andrx Corporation


Andrx Corporation, Fort Lauderdale
Allison Tomek, 954-382-7696
Email: Allison.Tomek@andrx.com

<p align="center">Page 3</p>

# EXHIBIT D

SC TO-C 1 dsctoc.htm SCHEDULE TO-C

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

### WASHINGTON, D.C. 20549

## SCHEDULE TO - C

**Tender Offer Statement under Section 14(d)(1) or 13(e)(1)
of the Securities Exchange Act of 1934**

# Biosite Incorporated

(Name of Subject Company (Issuer))

# Beckman Coulter, Inc.
# Louisiana Acquisition Sub, Inc.

(Name of Filing Persons (Offerors))

**Common Stock, par value $0.001 per Share**
**(Titles of Classes of Securities)**

---

**090945106**
(CUSIP Number of Class of Securities)

**Scott Garrett**
**President & CEO**
**Beckman Coulter, Inc.**
**4300 N. Harbor Boulevard**
**Fullerton, California 92834-3100**
**(714) 871-4848**
(Name, address and telephone number of person authorized
to receive notices and communications on behalf of the filing person)

**Copies to:**
**Paul D. Tosetti**
**Jonn R. Beeson**
**Cary K. Hyden**
**Latham & Watkins**
**633 W. 5th Street, Suite 4000**
**Los Angeles, CA 90071**
**(213) 485-1234**

## CALCULATION OF FILING FEE

| Transaction Valuation | Amount of Filing Fee |
|---|---|
| $N/A | $N/A |

☐   Check the box if any part of the fee is offset as provided by Rule 0-11(a)(2) and identify the filing with which the offsetting fee was previously paid. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

| | | | |
|---|---|---|---|
| Amount Previously Paid: | N/A | Filing Party: | N/A |
| Form or Registration No. | N/A | Date Filed: | N/A |

☒   Check the box if the filing relates solely to preliminary communications made before the commencement of a tender offer.

Check the appropriate boxes below to designate any transactions to which the statement relates:

☒   third-party tender offer subject to Rule 14d-1.

☐   issuer tender offer subject to Rule 13e-4.

☐   going-private transaction subject to Rule 13e-3.

☐   amendment to Schedule 13D under Rule 13d-2.

Check the following box if the filing is a final amendment reporting the results of the tender offer: ☐

This filing relates solely to preliminary communications made before the commencement of a tender offer for the outstanding common stock of Biosite Incorporated ("Biosite") by Louisiana Acquisition Sub, Inc. (the "Purchaser"), a wholly-owned subsidiary of Beckman Coulter, Inc. ("Beckman"). Attached is the press release issued by Beckman on March 25, 2007.

This filing and the attached exhibit is neither an offer to purchase nor a solicitation of an offer to sell shares of Biosite. The tender offer for the shares of Biosite has not commenced. Stockholders of Biosite are urged to read the relevant tender offer documents when they become available because they will contain important information that stockholders should consider before making any decision regarding tendering their shares. At the time the offer is commenced, Beckman and the Purchaser will file tender offer materials with the U.S. Securities and Exchange Commission (SEC) and Biosite will file a Solicitation/Recommendation Statement with respect to the offer. The tender offer materials (including an Offer to Purchase, a related Letter of Transmittal and certain other offer documents) and the Solicitation/Recommendation Statement will contain important information, which should be read carefully before any decision is made with respect to the tender offer. The Offer to Purchase, the related Letter of Transmittal and certain other offer documents, as well as the Solicitation/Recommendation Statement, will be made available to all stockholders of Biosite at no expense to them. The tender offer materials and the Solicitation/Recommendation Statement will be made available for free at the SEC's web site at www.sec.gov. Free copies of these documents will also be made available from Beckman.

**Exhibit Index**

| Exhibit No. | Document Description |
|-------------|---------------------|
| 99.1 | Press Release dated March 25, 2007. |

# EXHIBIT E

8-K 1 a07-9014_18k.htm 8-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C.  20549

---

# FORM 8-K

### CURRENT REPORT
### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported):  **March 24, 2007**

---

# BIOSITE INCORPORATED
(Exact name of registrant as specified in its charter)

**Delaware**
(State or other jurisdiction of incorporation)

| | |
|---|---|
| **000-21873** | **33-0288606** |
| (Commission File Number) | (IRS Employer Identification No.) |

**9975 Summers Ridge Road
San Diego, California  92121**
(Address of principal executive offices, including Zip Code)

Registrant's telephone number, including area code: **(858) 805-2000**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01. Entry into a Material Definitive Agreement.**

On March 24, 2007, Biosite Incorporated ("Biosite") entered into a definitive Agreement and Plan of Merger (the "Merger Agreement"), by and among Beckman Coulter, Inc., a Delaware corporation ("Parent"), Louisiana Acquisition Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent ("Purchaser"), and Biosite. Pursuant to the Merger Agreement, and upon the terms and subject to the conditions thereof, Purchaser will commence a tender offer (the "Offer") to acquire all of the outstanding shares of common stock, par value $0.001 per share ("Biosite Common Stock"), of Biosite at a price of $85.00 per share in cash without interest (the "Offer Price").

The Merger Agreement also grants to Purchaser an irrevocable option to acquire directly from Biosite a number of additional shares of Biosite Common Stock that does not exceed 19.9% of Biosite's outstanding Common Stock as of the date of the Merger Agreement upon the terms and subject to the conditions set forth in the Merger Agreement (the "Top-Up Option"), so long as immediately following the exercise of the Top-Up Option, Parent, Purchaser and their respective subsidiaries and affiliates will collectively own at least 90% of Biosite's outstanding Common Stock. Pursuant to the Merger Agreement, as soon as practicable after acquiring shares of Biosite Common Stock pursuant to the Offer (and, if applicable, the Top-Up Option), and subject to the satisfaction or waiver of certain conditions set forth in the Merger Agreement, Purchaser will merge with and into Biosite (the "Merger") and Biosite will become a wholly-owned subsidiary of Parent. In the Merger, the shares of Biosite Common Stock remaining outstanding following the consummation of the Offer, other than shares held by Parent, Purchaser or any other subsidiary of Purchaser, or by stockholders who have preserved their appraisal rights under Delaware law, will be converted into the right to receive the Offer Price.

The obligation of Purchaser to accept for payment and pay for the shares tendered in the Offer is subject to the satisfaction or waiver of a number of offer conditions set forth in the Merger Agreement, including, among others, the expiration of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended. In addition, it is also a condition to Purchaser's obligation to accept for payment and pay for the shares tendered in the Offer that at least a majority of the then-outstanding shares of Biosite Common Stock (determined on a fully-diluted basis) shall have been tendered in accordance with the terms of the Offer and not validly withdrawn (the "Minimum Condition"). The Minimum Condition may not be changed or waived by Parent or Purchaser without the prior written consent of Biosite.

The closing of the Merger is subject to customary closing conditions. Depending on the number of shares held by Parent and Purchaser after Purchaser's acceptance of the shares tendered in accordance with the terms of the Offer (and, if applicable, Purchaser's acquisition of Biosite Common Stock pursuant to the Top-Up Option), approval of the Merger by the holders of the outstanding shares of Biosite Common Stock remaining after the completion of the Offer may be required.

Biosite has agreed to operate its business in the ordinary course until the Merger is consummated. Biosite has also agreed not to solicit or engage in discussions with third parties regarding other proposals to acquire Biosite, subject to specified exceptions. The Merger Agreement also includes termination provisions for both Biosite and Parent. In connection with the termination of the Merger Agreement under specified circumstances involving another proposal to acquire Biosite or a change in the recommendation by Biosite's Board of Directors of

2

the transaction to Biosite's stockholders, Biosite may be required to pay Parent a termination fee of $50 million.

Concurrently with the execution of the Merger Agreement, Parent and Biosite entered into Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreements with each of Kim D. Blickenstaff, Kenneth F. Buechler and Gunars E. Valkirs (the "Non-Competition Agreements"). The Non-Competition Agreements, which are effective and contingent upon the effective time of the Merger (the "Effective Time"), provide for the assignment of applicable intellectual property rights to Biosite following the Effective Time and contain confidentiality, non-competition and non-solicitation obligations of the foregoing individuals, subject in each case to exceptions specified in the Non-Competition Agreements.

A copy of the Merger Agreement is attached as Exhibit 2.1 to this report and is incorporated herein by reference. Copies of the Non-Competition Agreements are attached as Exhibits 10.1, 10.2 and 10.3 to this report and are incorporated herein by reference. The foregoing descriptions of the Merger Agreement and Non-Competition Agreements do not purport to be complete and are qualified in their entirety by reference to the Merger Agreement and Non-Competition Agreements, respectively.

The Merger Agreement has been included to provide investors and stockholders with information regarding its terms. It is not intended to provide any other factual information about Biosite. The Merger Agreement contains representations and warranties that the parties to the Merger Agreement made to (and solely for the benefit of) each other. The assertions embodied in such representations and warranties are qualified by information contained in the confidential disclosure schedule that Biosite delivered in connection with signing the Merger Agreement. Accordingly, investors and stockholders should not rely on such representations and warranties as characterizations of the actual state of facts or circumstances, since they were only made as of the date of the Merger Agreement and are modified in important part by the underlying confidential disclosure schedule. Moreover, information concerning the subject matter of such representations and warranties may change after the date of the Merger Agreement, which subsequent information may or may not be fully reflected in Biosite's public disclosures.

A copy of a press release issued by Biosite on March 25, 2007 concerning the foregoing is attached as Exhibit 99.1 to this report.

*Additional Information and Where To Find It*

*This report is neither an offer to purchase nor a solicitation of an offer to sell shares of Biosite. The tender offer for the shares of Biosite has not commenced. Stockholders of Biosite are urged to read the relevant tender offer documents when they become available because they will contain important information that stockholders should consider before making any decision regarding tendering their shares. At the time the offer is commenced, Parent and Purchaser will file tender offer materials with the U.S. Securities and Exchange Commission (SEC), and Biosite will file a Solicitation/Recommendation Statement with respect to the offer. The tender offer materials (including an Offer to Purchase, a related Letter of Transmittal and certain other offer documents) and the Solicitation/Recommendation Statement will contain important information, which should be read carefully before any decision is made with respect to the tender offer. The Offer to Purchase, the related Letter of Transmittal and certain other offer documents, as well as the Solicitation/Recommendation Statement, will be made available to all stockholders of Biosite*

3

*at no expense to them. The tender offer materials and the Solicitation/Recommendation Statement will be made available for free at the SEC's website at http://www.sec.gov. In addition, stockholders will be able to obtain a free copy of these documents (when they become available) from (i) Parent by mailing requests for such materials to: Beckman Coulter, Inc., Office of Investor Relations (M/S A-37-C), 4300 N. Harbor Blvd., P. O. Box 3100, Fullerton, CA 92834 and (ii) Biosite by mailing requests for such materials to: Investor Relations, Biosite, 9975 Summers Ridge Road, San Diego, California 92121.*

*In addition to the Offer to Purchase, the related Letter of Transmittal and certain other offer documents, as well as the Solicitation/Recommendation Statement, Biosite and Parent file annual, quarterly and special reports, proxy statements and other information with the SEC. You may read and copy any reports, statements or other information filed by Biosite or Parent at the SEC public reference room at 100 F Street, N.E., Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the public reference room. Biosite's and Parent's filings with the Commission are also available to the public from commercial document-retrieval services and at the website maintained by the Commission at http://www.sec.gov.*

### Item 3.03. Material Modification to Rights of Security Holders.

On March 24, 2007, Biosite entered into an Amendment No. 3 to Rights Agreement, by and between American Stock Transfer & Trust Company (successor-in-interest to Fleet National Bank (f.k.a. BankBoston, N.A)) (the "Rights Agent") and Biosite (the "Amendment"). The Amendment amends the terms of that certain Rights Agreement, dated as of October 22,1997, by and between Biosite and the Rights Agent (the "Rights Agreement"), as previously amended on December 9, 1999 and July 18, 2001. The Amendment was entered into in order to ensure that the Merger Agreement, the Offer, the Top-Up Option, the Merger or the consummation of any other transaction contemplated by the Merger Agreement does not trigger the distribution and/or exercise of the Rights (as defined in the Rights Agreement). The Amendment provides that, among other things, (i) no Person (as defined in the Rights Agreement) will be or become an Acquiring Person (as defined in the Rights Agreement) as a result of, among other things, the execution and delivery of the Merger Agreement, the Offer, the Top-Up Option, the Merger or the other transactions contemplated by the Merger Agreement; (ii) no Stock Acquisition Date (as defined in the Rights Agreement) or Distribution Date (as defined in the Rights Agreement) will occur as a result of, among other things, the execution and delivery of the Merger Agreement, the Offer, the Top-Up Option, the Merger or the other transactions contemplated by the Merger Agreement; and (iii) the Rights will expire immediately prior to the Effective Time (as defined in the Merger Agreement).

A copy of the Amendment is attached as Exhibit 10.4 to this report and is incorporated herein by reference. The foregoing description of the Amendment does not purport to be complete and is qualified in its entirety by reference to the Amendment.

4

**Item 9.01.  Financial Statements and Exhibits.**

(d)  Exhibits

| Number | Description |
|---|---|
| 2.1 | Agreement and Plan of Merger, dated as of March 24, 2007, by and among Beckman Coulter, Inc., a Delaware corporation ("Parent"), Louisiana Acquisition Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent, and Biosite Incorporated. |
| 10.1 | Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreement, dated as of March 24, 2007, by and between Parent, Biosite Incorporated and Kim D. Blickenstaff. |
| 10.2 | Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreement, dated as of March 24, 2007, by and between Parent, Biosite Incorporated and Kenneth F. Buechler. |
| 10.3 | Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreement, dated as of March 24, 2007, by and between Parent, Biosite Incorporated and Gunars E. Valkirs. |
| 10.4 | Amendment No. 3 to Rights Agreement, dated as of March 24, 2007, by and between American Stock Transfer & Trust Company (successor-in-interest to Fleet National Bank (f k.a. BankBoston, N.A.)) and Biosite Incorporated. |
| 99.1 | Press release of Biosite Incorporated, dated March 25, 2007. |

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**Biosite Incorporated**

Dated: March 26, 2007

By: _____/s/ Christopher J. Twomey_____
Christopher J. Twomey
*Senior Vice President, Finance and Chief Financial Officer*

6

## EXHIBIT INDEX

| Number | Description |
| --- | --- |
| 2.1 | Agreement and Plan of Merger, dated as of March 24, 2007, by and among Beckman Coulter, Inc., a Delaware corporation ("Parent"), Louisiana Acquisition Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Parent, and Biosite Incorporated. |
| 10.1 | Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreement, dated as of March 24, 2007, by and between Parent, Biosite Incorporated and Kim D. Blickenstaff. |
| 10.2 | Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreement, dated as of March 24, 2007, by and between Parent, Biosite Incorporated and Kenneth F. Buechler. |
| 10.3 | Non-Competition, Non-Disclosure and Intellectual Property Assignment Agreement, dated as of March 24, 2007, by and between Parent, Biosite Incorporated and Gunars E. Valkirs. |
| 10.4 | Amendment No. 3 to Rights Agreement, dated as of March 24, 2007, by and between American Stock Transfer & Trust Company (successor-in-interest to Fleet National Bank (f k.a. BankBoston, N.A.)) and Biosite Incorporated. |
| 99.1 | Press release of Biosite Incorporated, dated March 25, 2007. |

7

EX-99.1 2 dex991.htm PRESS RELEASE DATED MARCH 25, 2007

**EXHIBIT 99.1**



NEWS RELEASE

Contacts: **For Beckman Coulter**
Robert Raynor
Director, Investor Relations
(714) 773-7620

**For Biosite**
Nadine Padilla
Vice President, Corporate & Investor Relations
(858) 805-2820

<u>**BECKMAN COULTER TO ACQUIRE BIOSITE INCORPORATED**</u>

*- Creates Leading Position in U.S. Immunoassay Market Segment, Complementing Established Leadership Positions in U.S. Chemistry and Hematology Segments*

*- Combines Extensive Installed Base of Clinical Lab Systems with Top Developer of Novel Immunoassay Tests*

*- Expands Beckman Coulter's Served Market to "Near-Patient" Testing and Extends Geographic Reach for Biosite's Products*

*- Transaction Expected to Immediately Accelerate Revenue Growth, Improve Operating Margins and be Accretive to GAAP Earnings in 2008 and Beyond*

FULLERTON, CA and SAN DIEGO, CA, March 25, 2007—Beckman Coulter, Inc. (NYSE: BEC), a leading developer, manufacturer, and marketer of products that simplify, automate, and innovate complex biomedical tests, and Biosite® Incorporated (NASDAQ: BSTE), a leading biomedical company commercializing proteomics discoveries for the advancement of medical diagnosis, announced today that they have entered into a definitive merger agreement under which Beckman Coulter will acquire all of Biosite's outstanding common stock in a cash tender offer of $85.00 per share, or approximately $1.55 billion on a fully diluted share basis. The proposed transaction is expected to immediately accelerate Beckman Coulter's revenue growth, improve operating margins and be accretive to GAAP earnings in 2008 and beyond.

Scott Garrett, Beckman Coulter's President and Chief Executive Officer, said, "This is an exciting transaction that grew out of our successful relationship with Biosite over the past four years in the area of B-type Natriuretic Peptide (BNP), a test that aids in the diagnosis, risk stratification and assessment of severity of heart failure and the risk stratification of patients with acute coronary syndromes. It will position Beckman Coulter as a leading provider of immunoassay tests, especially within cardiac diagnostics. Biosite utilizes third-party distributors, and more than 85% of sales come from within the

United States. A major source of value in the transaction is our ability to leverage our global commercial infrastructure and installed base to expand sales of Biosite's immunoassay tests, including BNP. Longer term, we will have significant opportunities to leverage Biosite's pipeline of novel diagnostic tests across our large installed base of automated systems in hospital laboratories. Additionally, the transaction will expand our offerings into near-patient testing, providing additional markets for many of our highest-value tests."

Biosite's Chairman and Chief Executive Officer, Kim Blickenstaff, stated, "We have enjoyed a close relationship with Beckman Coulter, and together we can enhance our delivery of high value diagnostic solutions that improve clinical and economic outcomes for acute diseases. Our focus is clearly aligned with Beckman Coulter's dedication to improving patient health and reducing the cost of care. Beckman Coulter's reputation and global infrastructure will be instrumental in expanding the market opportunity for our Triage® family of diagnostic products around the world. Our board of directors believes that this transaction is in the best interest of our stockholders, employees and other stakeholders and has unanimously voted to recommend that Biosite stockholders tender their shares in this offer."

Scott Garrett added, "We expect the transaction to be accretive to GAAP earnings in 2008, and we remain on track to achieve our full year 2007 outlook, as stated in our February 8 earnings release, excluding any impact from the Biosite acquisition. We expect significant revenue growth resulting from the improved effectiveness to leverage our global commercial franchise selling BNP along with other cardiac markers. Biosite will bring to Beckman Coulter an entrepreneurial culture and talented workforce recognized for product and market development. Everyone at Beckman Coulter looks forward to expanding our collaboration with the Biosite team in San Diego and elsewhere, as we maintain and grow the center of excellence that Biosite has established."

Beckman Coulter will promptly commence a tender offer for all of Biosite's outstanding common stock. The offer is conditioned upon at least a majority of the outstanding Biosite shares, determined on a fully diluted basis, being tendered, as well as the satisfaction of regulatory and other customary conditions. Approval of the transaction by Beckman Coulter's stockholders is not required. It is currently expected that the transaction will close in the second quarter of 2007.

### Advisors

Morgan Stanley is acting as financial advisor to Beckman Coulter in connection with the acquisition and is serving as dealer manager for the proposed tender offer. Goldman Sachs is acting as financial advisor to Biosite. Financing for the transaction has been fully committed by Morgan Stanley and

Citigroup. Latham & Watkins, LLP is serving as legal counsel to Beckman Coulter and Cooley Godward Kronish LLP is serving as legal counsel to Biosite.

### Investor Webcast Event

Beckman Coulter will host a webcast on Monday, March 26, 2007, at 8:30 am ET to discuss the transaction. The audio portion of the event may be accessed by dialing (877) 516-3365 or (706) 679-3246 and asking for the Beckman Coulter conference call or reservation #3687656.

To participate via the website and obtain access to the presentation materials, please go to Beckman Coulter's website at www.beckmancoulter.com and select "go to IR" under Investor Relations and find the call listed under "What's Ahead". The webcast will be archived for future on-demand replay.

### About Beckman Coulter

Beckman Coulter, Inc., based in Fullerton, California, develops, manufactures and markets products that *simplify automate, and innovate* complex biomedical tests. More than 200,000 Beckman Coulter systems operate in laboratories around the world supplying critical information for improving patient health and reducing the cost of care. Recurring revenues consisting of supplies, test kits, service and operating-type lease payments represent more than 75 percent of the company's 2006 annual sales of $2.5 billion. For more information, visit www.beckmancoulter.com.

### About Biosite

Biosite Incorporated is a leading bio-medical company commercializing proteomics discoveries for the advancement of medical diagnosis. The company's products contribute to improvements in medical care by aiding physicians in the diagnosis of critical diseases and health conditions. The Biosite Triage® rapid diagnostic tests are used in more than 70 percent of U.S. hospitals and in more than 60 international markets. Information on Biosite can be found at www.biosite.com.

### Forward Looking Statements

This press release contains forward-looking statements, including statements regarding the anticipated closing of the above described acquisition, the expected effect of the acquisition on Beckman Coulter's EPS, operating margins, and revenue growth, and its role in advancing Beckman Coulter's business. These statements are based on current expectations, forecasts and assumptions. Actual results could differ materially from those anticipated by these forward-looking statements as a result of a number of factors, some of which may be beyond Beckman Coulter's control. Among other things, these factors include the risk that the acquisition will not be completed because the tender offer did not proceed as anticipated or closing conditions to the acquisition

were not satisfied. Other factors include the possibility that the company will not be able to obtain the leverage across the companies' installed base that is anticipated, that the changes to infrastructure will not be realized or will cost more than anticipated, and that the Company's financial results, including the number of shares outstanding, will be different from those anticipated when the effects on EPS, operating margins, and revenue growth were calculated. For a further list and description of risks and uncertainties associated with Beckman Coulter's and Biosite's businesses, see their reports filed with the Securities and Exchange Commission, including each company's "Risk Factors" section in its most recent annual report on Form 10-K filed with the Securities and Exchange Commission. Beckman Coulter disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

**Additional Information and Where to Find It**

This announcement is neither an offer to purchase nor a solicitation of an offer to sell shares of Biosite. The tender offer for the shares of Biosite has not commenced. Stockholders of Biosite are urged to read the relevant tender offer documents when they become available because they will contain important information that stockholders should consider before making any decision regarding tendering their shares. At the time the offer is commenced, Beckman Coulter and its acquisition subsidiary will file tender offer materials with the U.S. Securities and Exchange Commission (SEC) and Biosite will file a Solicitation/Recommendation Statement with respect to the offer. The tender offer materials (including an Offer to Purchase, a related Letter of Transmittal and certain other offer documents) and the Solicitation/Recommendation Statement will contain important information, which should be read carefully before any decision is made with respect to the tender offer. The Offer to Purchase, the related Letter of Transmittal and certain other offer documents, as well as the Solicitation/Recommendation Statement, will be made available to all stockholders of Biosite at no expense to them. The tender offer materials and the Solicitation/Recommendation Statement will be made available for free at the SEC's web site at www.sec.gov. Free copies of these documents are also available from Beckman Coulter.

In addition to the Offer to Purchase, the related Letter of Transmittal and certain other offer documents, as well as the Solicitation/Recommendation Statement, Beckman Coulter and Biosite file annual, quarterly and special reports, proxy statements and other information with the SEC. You may read and copy any reports, statements or other information filed by Beckman Coulter and Biosite at the SEC public reference room at 100 F Street, N.E., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. Beckman Coulter's and Biosite's filings with the SEC are also available to the public from commercial document-retrieval services and at the website maintained by the SEC at http://www.sec.gov.

# EXHIBIT F

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

**1**

```
1  UNITED STATES SECURITIES AND EXCHANGE COMMISSION
2
3  In the Matter of:              )
4  TRADING IN THE SECURITIES OF   )FILE NO. SF-03247
5  UNITED SURGICAL PARTNERS       )
6  INTERNATIONAL, INC.,           )
7  and BIOSITE, INC.              )
8
9  WITNESS:  Michael F. Kara
10 PAGES:    1 through 76
11 PLACE:    Securities and Exchange Commission
12           44 Montgomery Street, Suite 2600
13           San Francisco, CA
14 DATE:     Friday, August 1, 2008
15
16     The above-entitled matter came on for hearing, pursuant
17 to notice, at 10:05 a.m.
18
19
20
21
22
23
24           Diversified Reporting Services, Inc.
25                   (202) 467-9200
```

**2**

```
1  APPEARANCES:
2
3  On behalf of the Securities and Exchange Commission:
4      LLOYD FARNHAM, ESQ.
5      PATRICK MURPHY, ESQ.
6      Division of Enforcement
7      Securities and Exchange Commission
8      44 Montgomery Street, Suite 2600
9      San Francisco, CA 94104
10     415-705-2487
11     415-705-2501 FAX
12
13 On behalf of the Witness:
14     JOHN C. KIRKE, ESQ.
15     Donahue Gallagher Woods LLP
16     300 Lakeside Drive, Suite 1900
17     Oakland, CA 94612
18     510-451-0544
19
20
21
22
23
24
25
```

**3**

```
1                  C O N T E N T S
2  WITNESSES                              EXAMINATION
3  Michael F. Kara                             5
4              EXHIBITS
5  EXHIBITS      DESCRIPTION               IDENTIFIED
6  44            Subpoena                      7
7  45            AT&T monthly statements       16
8  46            B of A Statement              34
9  47            Yahoo message board           70
10
11
12
13          PREVIOUSLY INTRODUCED EXHIBITS
14 EXHIBITS      DESCRIPTION               IDENTIFIED
15 1             Form 1662                     5
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1              P R O C E E D I N G S
2      MR. FARNHAM:  We re on the record on August 1,
3  2008, it s about at 10:05 a.m. in the morning.
4  Whereupon,
5          MOUNIR FAYEZ MICHAEL KARA
6  was called as a witness herein and, after having been first
7  duly sworn, was examined and testified as follows:
8              EXAMINATION
9      BY MR. FARNHAM:
10     Q   Could you please state and spell your full name for
11 the record?
12     A   Mounir, M-o-u-n-i-r, Fayez, F-a-y-e-z, Kara.  I m
13 also known as Michael F. Kara.
14     Q   And your last name is K-a-r-a?
15     A   Correct.
16     MR. FARNHAM:  My name is Lloyd Farnham, and I m an
17 officer of the Commission for purposes of this proceeding.
18     This is an investigation by the United States
19 Securities and Exchange Commission, in the matter of United
20 Surgical Partners International, Inc., and Biosite, Inc., to
21 determine whether there have been violations of certain
22 provisions of the Federal securities laws.  However, the
23 facts developed in this investigation might constitute
24 violations of other federal or state civil or criminal laws.
25     Prior to the opening of the record, you were
```

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

**5**

1 provided with a copy of the Formal Order of Investigation in
2 this matter. It will be available for your examination
3 during the course of this proceeding.
4    BY MR. FARNHAM:
5    Q  Mr. Kara, have you had an opportunity to review the
6 Formal Order?
7    A  Yes.
8    Q  Prior to the opening of the record, you were also
9 provided with a copy of the Commission s supplemental
10 Information Form, Form 1662, and a copy of that notice has
11 been marked as Exhibit 1.
12    (SEC Exhibit 1 was
13    marked for identification.)
14    Mr. Kara, have you had the opportunity to read
15 Exhibit 1?
16    A  Not all of it.
17    Q  Do you have any questions about it?
18    A  (No response.)
19    Q  Would you like more time to review it?
20    A  Can I ask my lawyer a question?
21    MR. FARNHAM:  Certainly. Why don t we go off the
22 record.
23    (off the record.)
24    THE WITNESS:  Yes, I ve seen it. I don t need
25 anymore time on it.

---

**6**

1    MR. FARNHAM:  Okay. We ll go back on the record
2 and we ll do that again.
3    THE WITNESS:  Okay.
4    MR. FARNHAM:  We re back on the record after a
5 brief break.
6    BY MR. FARNHAM:
7    Q  Mr. Kara, before we went off the record, I was
8 asking you about Exhibit 1, SEC Form 1662, and I was asking
9 if you have had the opportunity to review that form?
10    A  Yes.
11    Q  And do you have any questions concerning it?
12    A  No.
13    Q  And Mr. Kara, are you represented by counsel today?
14    A  Yes.
15    MR. FARNHAM:  And I d ask Mr. Kirke to identify
16 himself.
17    MR. KIRKE:  John Kirke, K-i-r-k-e, Donahue
18 Gallagher Woods LLP.
19    MR. FARNHAM:  And you re representing Mr. Kara as
20 his counsel today?
21    THE WITNESS:  Yes.
22    BY MR. FARNHAM:
23    Q  Mr. Kara, I m handing you what s been marked as
24 Exhibit 44. Exhibit 44 is a subpoena that was sent to your
25 counsel and it compels production of documents and testimony.

---

**7**

1 Have you seen Exhibit 44, the subpoena attached?
2    (SEC Exhibit No. 44 was
3    marked for identification.)
4    A  Yes, sir.
5    Q  And is that the subpoena pursuant to which you re
6 appearing today?
7    A  Yes, sir.
8    Q  And did you provide documents to your counsel for
9 production pursuant to that subpoena?
10    MR. KIRKE:  On the grounds of the Fifth Amendment,
11 my client will not answer that question.
12    MR. FARNHAM:  And it s my understanding, Mr. Kirke,
13 that your client may be asserting the Fifth Amendment in
14 response to some of the other questions today, is that
15 correct?
16    MR. KIRKE:  That is correct.
17    MR. FARNHAM:  In light of that, I m going to
18 provide some information regarding that.
19    Mr. Kara, I m not authorized to compel you to give
20 evidence or testimony as to which you assert your privilege
21 against self-incrimination, and I have no intention of doing
22 so. In addition, I do not have the authority to compel your
23 testimony by granting you immunity from prosecution. Any
24 question that I ask hereafter will be with the understanding
25 that if you wish to assert your privilege, you need merely

---

**8**

1 state that you refuse to answer on the grounds that your
2 answer might incriminate you. In other words, you re not
3 compelled to answer any further questions if you believe that
4 a truthful answer to the question might show that you
5 committed a crime and you wish to assert your privilege
6 against self-incrimination.
7    Accordingly, if you answer any questions, you will
8 be doing so voluntarily.
9    Do you have any questions about that?
10    THE WITNESS:  No.
11    MR. FARNHAM:  You should be aware that if you
12 refuse to answer a question based on your Fifth Amendment
13 privilege, a Judge or a Jury may take an adverse inference
14 against you in a civil action that the SEC may determine to
15 bring against you. That means that the Judge or Jury would
16 be permitted to infer that your answers to the questions
17 might incriminate you.
18    Do you have any questions about that?
19    THE WITNESS:  No.
20    BY MR. FARNHAM:
21    Q  Mr. Kara, what s your date of birth?
22    A  March 2, ████
23    Q  What your home address?
24    A  ██████████████████████████ California
25 █████████

9

```
 1    Q  Mr. Kara, I would ask you to speak up today because
 2  it s being recorded and later transcribed, so it s important
 3  that the recording device capture everything you say today.
 4  It s also important that we not talk over each other, so let
 5  me finish my question and I ll let you finish your answer.
 6       How long have you lived at the ███████████
 7  address?
 8    A  Approximately two years.
 9    Q  And where did you live before that?
10    A  ██████████████
11    Q  What was the city?
12    A  Vallejo.
13    Q  How long did you live at that Vallejo address?
14    A  Approximately five years.
15    Q  Do you own the home at ███████████████?
16    A  Yes.
17    Q  How much was the purchase price of that house?
18       MR. KIRKE:  Michael, answer it s the Fifth
19  Amendment.
20       BY MR. FARNHAM:
21    Q  Did you own the house at ████████████ in
22  Vallejo?
23    A  Yes.
24    Q  What was the sale price of that house when you sold
25  it?
```

10

```
 1       MR. KIRKE:  Michael, answer it s the Fifth
 2  Amendment.
 3       MR. FARNHAM:  Let s go off the record for a minute.
 4       (off the record.)
 5       MR. FARNHAM:  Back on the record.
 6       BY MR. FARNHAM:
 7    Q  Mr. Kara, in response to a couple of questions your
 8  attorney has stated that you would be asserting your Fifth
 9  Amendment right against self-incrimination, is that correct?
10    A  Yes.
11    Q  I want to make sure that that would be your
12  response to the questions I asked, in which your attorney
13  said that you would assert the Fifth Amendment.  So let me
14  go back to a couple of those questions and we ll redo them.
15       I asked if you owned your home at ████████████
16  █████- well, actually, I m sorry.  I asked what the
17  purchase price of your home at ████████████was.  Do
18  you intend to assert your Fifth Amendment rights in response
19  to that question?
20    A  Yes.
21    Q  And to have a shorthand so that we can, you know,
22  you can answer the question that way more efficiently, I
23  don t know, perhaps you could say, I assert my Fifth
24  Amendment rights, or, I assert the privilege against self-
25  incrimination, either of those responses to me would be fine
```

11

```
 1  as a shorthand for if you are intending to assert your Fifth
 2  Amendment right against self-incrimination and not respond to
 3  the question.
 4       Is that agreeable to everyone?
 5       MR. KIRKE:  Yes.
 6       BY MR. FARNHAM:
 7    Q  And you understand that, Mr. Kara?
 8    A  Yes.
 9    Q  Mr. Kara, where were you born?
10    A  Beirut, Lebanon.
11    Q  And did you -- when did you come to the United
12  States?
13    A  1976.
14    Q  And are you a citizen?
15    A  Yes.
16    Q  When did you become a citizen?
17    A  1981.
18    Q  From the time you were born in ██████ until 1976, did
19  you live in Beirut, Lebanon?
20    A  Yes.
21    Q  Are you married?
22    A  Yes.
23    Q  What s your wife s name?
24    A  Mariam Kara.
25    Q  Is that M-a-r-i-a-m?
```

12

```
 1    A  Correct.
 2    Q  What was her name before you were married?
 3    A  Mariam Dagher, D-a-g-h-e-r.
 4    Q  Were you married when you moved to the United
 5  States?
 6    A  No.
 7    Q  You and your wife got married in the U.S.?
 8    A  No.
 9    Q  Where were you married?
10    A  In Lebanon.
11    Q  Did you meet her in the United States?
12    A  No.
13    Q  You knew her before you moved to the United States?
14    A  Yes.
15    Q  But were married after you moved?
16    A  Yes.
17    Q  Do you have children?
18    A  Yes.
19    Q  What are their names and ages?
20    A  ████████████████████████
21    Q  Does ██████ still live at home with you?
22    A  Yes.
23    Q  Is he intending -- is he having an education, is he
24  getting an education?
25    A  Yes.
```

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008



**13**

1  Q  Where is that?
2  A  ██████████████
3  Q  But he still lives at home with you?
4  A  No, he lives in the dorms but he comes on the
5  weekends.
6  Q  Does -- and his name is ████ Kara?
7  A  Yeah.
8  Q  Does he have any brokerage accounts?
9  A  No.
10  Q  Does he do any stock trading?
11  A  No.
12  Q  Can you tell me the names of your parents?
13  A  ████ Kara.
14  Q  That's your father?
15  A  Yeah.
16  Q  And what's your mother's name?
17  A  ██████████ Kara.
18  Q  And where do they live?
19  A  My father is deceased and my mother lives at ██
20  ████████████ Vallejo.
21  Q  How do you spell ██████████
22  A  ██████
23  Q  Do you have any brothers or sisters?
24  A  Yes.
25  Q  What are their names?

**15**

1  Q  What does ██████████ do for a living?
2  A  He's a construction manager.
3  Q  Does he work for a company?
4  A  Yeah.
5  Q  What's the company?
6  A  ██████
7  Q  I'm sorry?
8  A  ██████████ one word.
9  Q  And that's a construction company?
10  A  Yeah.
11  Q  Any other brothers and sisters other than Maher and
12  ██████
13  A  No.
14  Q  Do you know -- I'm wondering what their ages are,
15  if you know either their age or the year of their birth?
16  A  Maher is ten years younger than me and ████ is
17  four, three or four.
18  Q  Years younger than you?
19  A  Yeah.
20  Q  And what does Maher Kara do for a living?
21      MR. KIRKE:  I direct my client to assert the Fifth
22  Amendment privilege against self-incrimination.
23      BY MR. FARNHAM:
24  Q  And Mr. Kara, are you going to assert that
25  privilege?



**14**

1  A  Maher Fayez Kara.
2  Q  Is that M-a-h-e-r?
3  A  Right.  And ██████████████
4  Q  ██████████████
5  A  ██████████
6  Q  And is that her married name?
7  A  Yes.
8  Q  What's her husband's name?
9  A  ██████████ I'm sorry.
10  Q  One of those things that slips your mind as soon as
11  the question is asked. ██████████████
12  A  Yes.
13  Q  And where do they live?
14  A  They live in ██████████
15  Q  California?
16  A  Yeah.
17  Q  What does ██████ do for a living?
18  A  She's a manager for ██████████
19  Q  Is there a particular division of ████ she works
20  in?
21  A  Yeah, Accounting.
22  Q  Is she an accountant?
23  A  Yeah.
24  Q  How long has she been working at ████████
25  A  Approximately 18 years.

**16**

1  A  Yes.
2  Q  What's your home phone number?
3  A  ██████ 6184.
4  Q  How long has that been your home phone number?
5  A  Since we lived there.
6  Q  Since you've moved to ██████████
7  A  Yes.
8  Q  Did you have a different home phone number in
9  Vallejo?
10  A  Yeah.
11  Q  Do you remember what that was?
12  A  Yeah.
13  Q  What was it?
14  A  ██████ 6131.
15  Q  I'm handing you what's been marked as Exhibit 45.
16  Do you recognize these as pages that were produced to the
17  SEC, to the Commission?
18      (SEC Exhibit No. 45 was
19      marked for identification.)
20      MR. KIRKE:  I direct my client to assert his Fifth
21  Amendment privilege against self-incrimination.
22      BY MR. FARNHAM:
23  Q  And Mr. Kara, in response to that question, are you
24  going to assert the privilege against self-incrimination?
25  A  Yes.

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

**17**

1    Q    On the first page of Exhibit 45, I want to ask what
2    the number -- there are a couple other phone numbers on this
3    bill -- one is ████7714, what is that, what do you use
4    that number for?
5         MR. KIRKE:  I direct my client to assert his Fifth
6    Amendment privilege against self-incrimination.
7         BY MR. FARNHAM:
8    Q    And Mr. Kara, are you going to assert that
9    privilege?
10   A    Yes.
11   Q    How about ████-7742, what do you use that number
12   for?
13        MR. KIRKE:  I direct my client to assert his Fifth
14   Amendment privilege against self-incrimination.
15        BY MR. FARNHAM:
16   Q    Mr. Kara, do you have a mobile phone?
17   A    Yes.
18   Q    What s the number of that?
19   A    ████2202.
20   Q    And does your wife, ████ have a cell phone?
21   A    Yes.
22   Q    What s that number?
23   A    ████1642.
24   Q    And who are the carriers for those mobile numbers?
25   A    I don t know.

---

**18**

1    Q    Does your wife handle those cell phones?
2    A    Yes.
3    Q    If you look at the second page of Exhibit 45, is
4    this a bill for a number for Applied Remedial services?
5         MR. KIRKE:  I direct my client to assert his Fifth
6    Amendment privilege against self-incrimination.
7         BY MR. FARNHAM:
8    Q    And Mr. Kara, would you assert that privilege in
9    response to that question?
10   A    Yes.
11   Q    And what is ████4205?
12        MR. KIRKE:  I direct my client to assert his
13   privilege against self-incrimination.
14        BY MR. FARNHAM:
15   Q    And Mr. Kara, do you assert the privilege?
16   A    Yes.
17   Q    On the third page of Exhibit 45, the page that has
18   M-i-k-a-r-a 755 on the bottom right, is this a cell phone
19   bill for your mobile phone?
20        MR. KIRKE:  I direct my client to assert his
21   privilege against self-incrimination.
22        THE WITNESS:  YES.
23        BY MR. FARNHAM:
24   Q    Mr. Kara, are you answering or are you asserting
25   your privilege against self-incrimination?

---

**19**

1    A    I m sorry. I m asserting my privilege against
2    self-incrimination.
3    Q    And is -- you said that your wife handles the cell
4    phones, is that why her name appears on this bill?
5         MR. KIRKE:  I direct my client to assert his
6    privilege against self-incrimination.
7         BY MR. FARNHAM:
8    Q    And Mr. Kara, do you assert the privilege?
9    A    Yes.
10   Q    The last page of Exhibit 45 -- well, let me ask
11   this. Do you have internet service at your home?
12   A    Yes.
13   Q    And who is the service provider for that internet
14   service?
15   A    AOL maybe.
16   Q    You don t know?
17   A    No.
18   Q    Does someone else handle that?
19   A    Yes.
20   Q    Who is that?
21   A    Mariam.
22   Q    Your wife?
23   A    Yes.
24   Q    And is -- looking at the last page of Exhibit 45,
25   with the No. 757 in the bottom right, is this a bill from

---

**20**

1    Comcast for internet service?
2         MR. KIRKE:  I direct my client to assert his Fifth
3    Amendment right.
4         BY MR. FARNHAM:
5    Q    And Mr. Kara, do you assert that right?
6    A    Yes.
7    Q    What s the home phone number at your mother s house
8    in vallejo?
9    A    ████9720.
10   Q    Does she have a mobile phone?
11   A    Yeah.
12   Q    What s the number for that?
13   A    I don t remember.
14   Q    Where is Maher Kara currently living?
15        MR. KIRKE:  I direct my client to assert his Fifth
16   Amendment right.
17        BY MR. FARNHAM:
18   Q    And Mr. Kara, do you assert that right?
19   A    Yes.
20   Q    Do you know, what is Maher Kara s current home
21   phone number?
22   A    No.
23   Q    You don t know it?
24   A    No, honest.
25   Q    If you want to call him, how do you contact him?

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

**21**

1    MR. KIRKE: I direct my client to assert his Fifth
2 Amendment right.
3        BY MR. FARNHAM:
4    Q  And Mr. Kara, do you assert the privilege?
5    A  Yes.
6    Q  Could you describe, Mr. Kara, your education after
7 high school?
8    A  Yeah. I have a Biochemistry Degree, Bachelor s
9 Degree in Biochemistry. And I completed my Master s Degree
10 courses in Toxicology. And I went to University of
11 California San Francisco and I did three years of research in
12 Pharmaceutical Chemistry. After my Biochemistry Degree, I
13 went for a very short period of time, less than a year, to a
14 Medical School, St. George s School of Medicine, in Grenada
15 West Indies.
16    Q  How do you spell St. George s?
17    A  Saint, S-t. George, as in George s.
18    Q  G-e-o-r-g-e?
19    A  Correct. School of Medicine, for a brief period of
20 time.
21    Q  And that s in Grenada?
22    A  West Indies.
23    Q  Where did you receive your Bachelor s Degree in
24 Biochemistry?
25    A  San Francisco State University.

---

**22**

1    Q  What year did you complete that degree?
2    A  1980. Forgive me, it s either 1980 or 1981.
3    Q  Was it immediately following that, that you
4 attended the Medical School in the West Indies?
5    A  Grenada, yes.
6    Q  And then when did you begin taking courses in
7 Toxicology?
8    A  1982.
9    Q  And where was that?
10    A  San Jose State University.
11    Q  And how long were you taking those courses?
12    A  Two years, finished them all.
13    Q  Did you receive a Master s Degree?
14    A  I did not write the thesis, did not finish writing
15 the thesis but got the letter from the University that you ve
16 been admitted to a Master s Degree.
17    Q  What does the study of Toxicology entail, what kind
18 of courses did you take?
19    A  A lot of Anatomy, Neuroanatomy, a lot of advanced
20 Biochemistry, Neurology, Pharmaceutical Chemistry,
21 Toxicology, Poisons.
22    Q  What was your thesis on, or going to be on?
23    A  It was going to be on a drug known as Valproic
24 Acid.
25    Q  Could you spell that for me?

---

**23**

1    A  V-a-l-p-r-o-i-c, Valproic Acid. How this drug
2 affected a certain enzyme in the liver when it was given in
3 conjunction with Phenobarbital, which is --
4    Q  Can you spell that?
5    A  Pheno, P-h-e-n-o, Barbitol, B-a-r-b-i-t-a-l. It s
6 an anti-epileptic drug.
7    Q  And then when did you do the research at the
8 University of California San Francisco?
9    A  I started in 1983. And I continued until 1986.
10    Q  Did you begin that research while you were still
11 taking courses at San Jose State?
12    A  Yes.
13    Q  Was that a research position, what was that?
14    A  No, research for towards the Master s thesis.
15    Q  Okay. Were you paid?
16    A  No, it was an unpaid position.
17    Q  And who were you working under?
18    A  ▮▮▮▮▮▮▮▮  Professor.
19    Q  Could you spell that for me?
20    A  ▮▮▮▮▮▮▮▮
21    Q  What was her first name?
22    A  ▮▮▮▮▮▮▮▮
23    Q  She was a professor there. And was the research
24 you were doing with her on Valproic Acid?
25    A  Yes.

---

**24**

1    Q  Why didn t you finish your thesis?
2        MR. KIRKE: I direct my client to assert his Fifth
3 Amendment privilege.
4        BY MR. FARNHAM:
5    Q  And Mr. Kara, do you assert your Fifth Amendment in
6 response to that question?
7    A  Yes.
8    Q  Why did you end your research work at UCSF?
9        MR. KIRKE: My client to assert his Fifth Amendment
10 right.
11        BY MR. FARNHAM:
12    Q  And Mr. Kara, do you assert your Fifth Amendment
13 right in response to that question?
14    A  Yes.
15    Q  Other than the things we ve just talked about, do
16 you have any other education or courses that you ve taken?
17    A  Well, I ve taken courses in my area of expertise,
18 which is in the hazardous waste business.
19    Q  Tell me about those course?
20    A  Those were basically advanced courses in the area
21 of, like for example, I m a Registered Environmental Assessor
22 by the state of California, and a Certified Asbestos
23 Inspector by the EPA. So, as part of these licenses, you
24 have to take continuing education courses, and so throughout
25 the years I ve taken many, you know, one day courses as part

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

25

1  of my continuing education.  I don t remember the names of
2  these courses but, they were multiple courses.  seminars, if
3  you will.
4        Q   And these are in the, you said they re in the field
5  of environmental and --
6        A   Hazardous waste.
7        Q   Hazardous waste?
8        A   Yes.
9        Q   Other than courses in that field, any other courses
10  or education related to what you were studying before,
11  Toxicology, Biochemistry?
12        A   Yeah, I kept up on Toxicology by taking, you know,
13  seminars in Toxicology, because in the hazardous waste
14  business we do risk assessments and that requires a
15  knowledge, a thorough knowledge of toxicology.
16        Q   When you were studying Valproic Acid, what was
17  going to be the purpose of the study?
18        MR. KIRKE:  My client asserts his Fifth Amendment
19  right, or I direct my client to assert his Fifth Amendment
20  right.
21            BY MR. FARNHAM:
22        Q   And Mr. Kara, do you assert your Fifth Amendment
23  right in response to that question?
24        A   Yes.
25        Q   And was Valproic Acid going to be a drug treatment

26

1  of some sort?
2        MR. KIRKE:  I direct my client to assert his Fifth
3  Amendment right.
4        THE WITNESS:  Yes.
5        MR. KIRKE:  I direct my client to assert
6  his privilege against self-incrimination.
7            BY MR. FARNHAM:
8        Q   And Mr. Kara, you re asserting that right?
9        A   Yes.
10        Q   After you stopped doing research at UCSF, what did
11  you do after that?
12        A   I found --
13        MR. KIRKE:  I m sorry -- in terms of employment?
14        MR. FARNHAM:  Education or employment?
15        THE WITNESS:  I found a job in the hazardous waste
16  business.
17            BY MR. FARNHAM:
18        Q   Who is that with?
19        A   Crosby & Overton.
20        Q   Crosby, c-r-o-s-b-y?
21        A   And overton.
22        Q   Can you spell that?
23        A   O-v-e-r-t-o-n.
24        Q   And that was a hazardous waste company?
25        A   Yes.

27

1        Q   How long did you work for them?
2        A   Between, I think, 1987 or 1986, 1986-1987 and until
3  1989.
4        Q   And what did you do after you stopped working for
5  Crosby & Overton?
6        A   I worked for a company called Ridel.
7        Q   R-i-d-e-l-l?
8        A   One l.
9        Q   And was that a hazardous waste clean-up company?
10        A   Yes.
11        Q   How long did you work for Ridel?
12        A   One year.
13        Q   And what did you do after you left Ridel?
14        A   I worked for First Environmental Group.
15        Q   How long did you work for them?
16        A   About a year, year and a half.
17        Q   Approximately what year did you stop working for
18  First Environmental Group?
19        A   1991, 1992.
20        Q   And what did you do after you left their
21  employment?
22        A   I started on my own.
23        Q   Did you start your own business?
24        A   Yes.
25        Q   What s the name of that business?

28

1        A   We had two companies, Applied Chemical Disposal and
2  Applied Remedial Services, Inc.
3        Q   When you say  we , what do you mean?
4        A   I speak in pleural terms, me.
5        Q   And did you start both of those companies -- well,
6  what year did you start those companies?
7        A   About 1993 or so, 1992, 1993.
8        Q   And what do those companies do?
9        A   One does, one did chemical packaging -- chemical
10  packaging and then labeling, transport and disposal of
11  pharmaceuticals, chemo, therapeutic agents, hazardous waste.
12  And the other one did the consulting end, the Remedial
13  services did the consulting end of the business, and then the
14  oversight of clean-up, management of sites with hazardous
15  waste on them.
16        Q   And are both these companies still active?
17        A   No.  Applied Chemical Disposal was shutdown
18  sometime maybe in 1996, yeah, 1996, 1997.
19        Q   And why was that?
20        MR. KIRKE:  I direct my client to assert his Fifth
21  Amendment right.
22            BY MR. FARNHAM:
23        Q   And Mr. Kara, are you going to assert that right in
24  response to that question?
25        A   Yes.

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

**29**

1  Q  And is Applied Remedial services still active?
2  A  Yes.
3  Q  And is that your current employment?
4  A  Yes.
5  Q  Do you have any other work or employment other than
6  your work with the business Applied Remedial services?
7  A  No.
8  Q  And what does Applied Remedial services currently
9  do?
10  A  As I explained earlier, we oversee and manage the
11  clean-up of contaminated sites.
12  Q  Do you, does the company have any employees other
13  than yourself?
14  A  Me and Mariam, and then we subcontract everything
15  that we need to outside companies.
16  Q  Are you currently working on any projects?
17  A  Yes.
18  Q  who are the clients for those projects?
19  MR. KIRKE:  I direct my client to assert his Fifth
20  Amendment right.
21  BY MR. FARNHAM:
22  Q  Does Applied Remedial services have an office?
23  A  Yes.
24  Q  where is that?
25  A  It s at ▮▮▮▮▮▮▮▮▮▮

**30**

1  Q  And that s your home address?
2  A  Yes.
3  Q  Is there a separate office space in your home?
4  A  Yes.
5  Q  Is there a number for Applied, phone number for
6  Applied Remedial services?
7  A  Yes.
8  Q  what is that?
9  A  ▮▮▮▮▮▮-7742.
10  Q  Is there a fax number for5 Applied Remedial
11  services?
12  A  Excuse me, excuse me, ▮▮▮▮
13  Q  so the phone number, telephone number for Applied
14  Remedial services is ▮▮▮▮-7742?
15  A  It s ▮▮▮ — no -- it s ▮▮▮▮▮ — I can t remember.
16  I can t remember.
17  Q  Do you have a fax machine in your office at home?
18  A  Yeah, yeah.
19  Q  Is the phone number for Applied Remedial services
20  ▮▮▮▮-4205?
21  A  That used to be the number about maybe three or
22  four years ago.
23  Q  okay.
24  A  I m sorry sir, I swear to you, I can t remember.
25  Q  Do you have a fax machine in your office?

**31**

1  A  Yes.
2  Q  what s the number for that?
3  A  If you can tell me, what was my home phone, do you
4  remember?  what was my home phone?
5  Q  Currently?
6  A  Yeah.
7  Q  I believe you said it was ▮▮▮▮-6184.
8  A  Okay.  Then it is ▮▮▮▮-7714, the fax.
9  Q  okay.  And you think that s a 707 area code?
10  A  No, 925.
11  Q  Okay.  So, the fax you believe is ▮▮▮▮-
12  A  7714.
13  Q  -- 7714.
14  A  And the phone number is ▮▮▮▮-7742.
15  Q  And you believe that s a ▮▮▮ area code?
16  A  No▮
17  Q  So the phone number you believe is ▮▮▮▮-7742?
18  A  Yes.
19  Q  what are your approximate -- what s your
20  approximate work schedule for Applied Remedial services?
21  MR. KIRKE:  I direct my client to assert his Fifth
22  Amendment right.
23  MR. FARNHAM:
24  Q  And Mr. Kara, do you assert that right in response
25  to that question?

**32**

1  A  Yes.
2  Q  Do you ever go out in the field to work at sites
3  that your company is working at?
4  A  Yes.
5  Q  How often do you do that?
6  MR. KIRKE:  I direct my client to assert his Fifth
7  Amendment right.
8  BY MR. FARNHAM:
9  Q  And Mr. Kara, do you assert that right?
10  A  Yes.
11  Q  Is Applied Remedial services, is it an incorporated
12  entity?
13  A  Yes.
14  Q  And how do you -- how are you compensated from that
15  entity?
16  A  We would draw salaries.
17  Q  You and your wife?
18  A  Yeah.
19  Q  Anyone else withdraw a salary?
20  A  No.
21  Q  what s the -- let s say over the last -- well,
22  let s say over 2007, .what was your income, your annual income
23  from your company?
24  MR. KIRKE:  I direct my client to assert his Fifth
25  Amendment right.

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

33

BY MR. FARNHAM:

2  Q  And Mr. Kara, do you assert that right in response
3  to that question?

4  A  Yes.

5  Q  If I ask you any questions about income you derive
6  from your business, will you assert your Fifth Amendment
7  right against self-incrimination?

8  MR. KIRKE:  I would so direct him.

9  THE WITNESS:  Yes.

10  BY MR. FARNHAM:

11  Q  Does Applied Remedial services have a bank account
12  or bank accounts?

13  A  Yeah.

14  Q  Where are those located, which bank?

15  A  Bank of America.

16  Q  Any other banks?

17  A  No.

18  Q  How many business accounts do you have in the name
19  of Applied Remedial services?

20  A  Two.

21  Q  And they re both at Bank of America?

22  A  Yeah.

23  Q  I m handing you what s been marked as Exhibit 46.
24  If you look at the last two pages of Exhibit 46, let me state
25  for the record Exhibit 46 is a document that s numbered

34

1  MIKARA822 through MIKARA827, and I want to ask you to look at
2  the last two pages numbered 826 and 827.  Are these the two
3  accounts that you re referring to?

4  (SEC Exhibit No. 46 was

5  marked for identification.)

6  MR. KIRKE:  I direct my client to assert his Fifth
7  Amendment right.

8  BY MR. FARNHAM:

9  Q  And Mr. Kara, do you assert that right?

10  A  Yeah.

11  Q  Why do you have two accounts for Applied Remedial
12  services?

13  MR. KIRKE:  I direct my client to assert his Fifth
14  Amendment right.

15  BY MR. FARNHAM:

16  Q  The bank accounts you referenced at Bank of America
17  for Applied Remedial services, do you use those account to
18  pay subcontractors in your business?

19  MR. KIRKE:  I direct my client to assert his Fifth
20  Amendment right.

21  BY MR. FARNHAM:

22  Q  And do you assert that right, Mr. Kara?

23  A  Yeah.

24  Q  Where do you personally have bank accounts?

25  A  B of A.

35

1  Q  Anyplace else?

2  A  No.

3  Q  How many accounts do you or your wife have at Bank
4  of America?

5  A  It looks like three.

6  Q  And are you looking at Exhibit 46?

7  A  Yeah.

8  Q  And did you, other than the three that are
9  reflected in Exhibit 46, are there any other bank accounts in
10  your name?

11  A  No.

12  Q  You don t have any bank accounts in any other
13  institutions?

14  A  No.

15  Q  Does your wife have any --

16  A  Excuse me --

17  Q  Go ahead.

18  A  At Schwab.

19  Q  Okay.  Is that a bank account or a brokerage
20  account?

21  A  Yeah.

22  Q  We ll get there.  I ll ask about Schwab.  Just a
23  moment.  Other than Schwab, Bank of America, does your wife
24  have any accounts anywhere else?

25  A  No.

36

1  Q  And you don t have any accounts anywhere else?

2  A  No.

3  Q  So, you mentioned you also have accounts at Schwab,
4  what kind of accounts do you have there?

5  A  Just one savings account, one inactive account, and
6  one trading account.

7  Q  And those are -- are those all accounts that you
8  can trade stocks in?

9  MR. KIRKE:  I direct my client to assert his Fifth
10  Amendment right.

11  BY MR. FARNHAM:

12  Q  And Mr. Kara, do you assert that right?

13  A  No.

14  Q  I m sorry?

15  A  Yes.

16  Q  And how long have you had those accounts with
17  Schwab?

18  MR. KIRKE:  I direct my client to assert his Fifth
19  Amendment right.

20  MR. KIRKE:  I direct my client to assert
21  his privilege against self-incrimination.

22  BY MR. FARNHAM:

23  Q  And Mr. Kara, do you assert the right?

24  A  Yes.

25  Q  Have you ever had any stock trading or brokerage

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

37

1  accounts at any other broker?
2        MR. KIRKE:  I direct my client to assert his Fifth
3  Amendment right.
4        BY MR. FARNHAM:
5    Q  And Mr. Kara, do you assert the right?
6    A  Yes.
7    Q  Other than Bank of America, have you had, in the
8  past, any bank accounts at any other banks?
9        MR. KIRKE:  I direct my client to assert his Fifth
10  Amendment right.
11        BY MR. FARNHAM:
12    Q  And Mr. Kara, do you assert that right?
13    A  Yeah.
14    Q  Where was Maher Kara -- you can leave that in front
15  of you.
16    A  Thank you.
17    Q  That s fine, thank you.  Where was Maher Kara born?
18    A  Beirut, Lebanon.
19    Q  When did he move to the United States?
20    A  In 1976.
21    Q  The same time that you did?
22    A  Yes.
23    Q  Did your family come over at that time also?
24    A  Yes.
25    Q  Your mother and father and sister?

---

38

1    A  Yes.
2    Q  Did anyone else from your family, other than those
3  people, come with you at that time?
4    A  No.
5    Q  Do you have other family currently living in the
6  United States?
7    A  Yes.
8    Q  Who is that?
9    A  Zahi Haddad, H-a-d-d-a-d.
10    Q  And is the first name Z-a-h-i?
11    A  Correct.
12    Q  And where does he live?
13    A  In Stockton.
14    Q  And he s your uncle?
15    A  Yes.
16    Q  When did he move to the United States?
17    A  I don t know.
18    Q  What does he do for a living?
19        MR. KIRKE:  I direct my client to assert his Fifth
20  Amendment right.
21        BY MR. FARNHAM:
22    Q  And Mr. Kara, do you assert that right in response
23  to that question?
24    A  Yes.
25    Q  Does Maher Kara have a Bachelor s Degree?

---

39

1    A  Yes.
2    Q  What is that in and when did he get it?
3    A  In Finance, Berkeley.
4    Q  And is that University of California Berkeley?
5    A  Yeah.
6    Q  Do you know when he got that degree?
7    A  No.
8    Q  Does he have any other degrees?
9    A  Yeah.
10    Q  What else?
11    A  MBA.
12    Q  Where did he receive that?
13    A  University of Chicago.
14    Q  Do you know the year he received that?
15    A  No.
16    Q  Did you provide any financial assistance to Maher
17  when he was getting his education at either of those
18  institutions?
19        MR. KIRKE:  I direct my client to assert his Fifth
20  Amendment right.
21        BY MR. FARNHAM:
22    Q  And Mr. Kara, do you assert that right?
23    A  Yes.
24    Q  And if I ask you any other questions about either
25  your assistance to Maher Kara for his education or how Maher

---

40

1  Kara paid for that education, would you assert your right
2  against self-incrimination?
3        MR. KIRKE:  I would so direct him.
4        THE WITNESS:  Yes.
5        BY MR. FARNHAM:
6    Q  What does Maher Kara do for a living?
7        MR. KIRKE:  I direct my client to assert his Fifth
8  Amendment right.
9        BY MR. FARNHAM:
10    Q  And Mr. Kara, would you do that?
11    A  Yes.
12    Q  Who is Maher Kara s current employer?
13        MR. KIRKE:  I direct my client to assert his Fifth
14  Amendment right.
15        BY MR. FARNHAM:
16    Q  And Mr. Kara, would you so answer?
17    A  Yes.
18    Q  And if I ask you any other questions about Maher
19  Kara s employment or work, would you assert your right
20  Amendment right against self-incrimination?
21    A  Yes.
22    Q  Were you aware that prior to April 2007, Maher Kara
23  worked at City Group Global Markets?
24        MR. KIRKE:  I direct my client to assert his Fifth
25  Amendment right.

REDACTED

---

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

41

1      BY MR. FARNHAM:
2      Q   And Mr. Kara, would you assert the privilege in
3  response to that question?
4      A   Yes.
5      Q   And did you know that his work involved advising
6  public companies in the pharmaceutical and healthcare
7  industries?
8          MR. KIRKE:  I direct my client to assert his Fifth
9  Amendment right.
10         BY MR. FARNHAM:
11     Q   And Mr. Kara, would you assert your Fifth Amendment
12  rights in response to that question?
13     A   Yes.
14     Q   And were you aware of any restrictions or
15  limitations on whether or not Maher Kara could share
16  confidential information from his work?
17         MR. KIRKE:  I direct my client to assert his Fifth
18  Amendment right.
19         BY MR. FARNHAM:
20     Q   And Mr. Kara, would you assert that right in
21  response to that question?
22     A   Yes.
23     Q   If I ask you any other questions about the nature
24  of Maher Kara s work, would you assert your Fifth Amendment
25  rights against self-incrimination?

---

42

1      A   Yes.
2      Q   Did you ever discuss stocks or companies with Maher
3  Kara?
4          MR. KIRKE:  I direct my client to assert his Fifth
5  Amendment right.
6          BY MR. FARNHAM:
7      Q   And Mr. Kara, would you assert that right in
8  response to that question?
9      A   Yes.
10     Q   Did Maher Kara ever provide any information about
11  any of the companies that he was working with?
12         MR. KIRKE:  I direct my client to assert his Fifth
13  Amendment right.
14         BY MR. FARNHAM:
15     Q   And Mr. Kara, would you assert that right in
16  response to that question?
17     A   Yes.
18     Q   Did Maher Kara ever provide any information related
19  to any companies that Citi Group was working with or for?
20         MR. KIRKE:  I direct my client to assert his Fifth
21  Amendment right.
22         BY MR. FARNHAM:
23     Q   And Mr. Kara, would you assert that right in
24  response to that question?
25     A   Yes.

---

43

1      Q   Did you ever discuss stock trading with Zahi
2  Haddad?
3          MR. KIRKE:  I direct my client to assert his Fifth
4  Amendment right.
5          BY MR. FARNHAM:
6      Q   And Mr. Kara, would you respond to that question by
7  asserting your Fifth Amendment rights?
8      A   Yes.
9      Q   Did you ever make recommendations to Zahi Haddad
10  regarding security investments or stock investments?
11         MR. KIRKE:  I direct my client to assert his Fifth
12  Amendment right.
13         BY MR. FARNHAM:
14     Q   And Mr. Kara, would you assert your Fifth Amendment
15  rights in response to that question?
16     A   Yes.
17     Q   Did you ever tell Zahi Haddad to open a brokerage
18  account?
19         MR. KIRKE:  I direct my client to assert his Fifth
20  Amendment right.
21         BY MR. FARNHAM:
22     Q   And Mr. Kara, would you assert your Fifth Amendment
23  rights in response to that question?
24     A   Yes.
25     Q   If I ask you any other questions about Zahi

---

44

1  Haddad s stock trading or your assistance to Mr. Haddad with
2  stock trading, would you assert your Fifth Amendment against
3  self-incrimination?
4      A   Yes.
5      Q   Who is Safwan Hito, s-a-f-w-a-n, H-i-t-o?
6      A   He s a very old friend of mine.
7      Q   How long have you known him?
8          MR. KIRKE:  I direct my client to assert his Fifth
9  Amendment right.
10         BY MR. FARNHAM:
11     Q   And Mr. Kara, do you assert your Fifth Amendment
12  rights in response to that question?
13     A   Yes.
14     Q   Where does Ms. Hito live?
15         MR. KIRKE:  I direct my client to assert his Fifth
16  Amendment right.
17         BY MR. FARNHAM:
18     Q   And Mr. Kara, would you assert your Fifth Amendment
19  rights in response to that question?
20     A   Yes.
21     Q   What does Mr. Hito do for a living?
22         MR. KIRKE:  I direct my client to assert his Fifth
23  Amendment right.
24         BY MR. FARNHAM:
25     Q   And Mr. Kara, would you assert your Fifth Amendment

REDACTED

---

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

45

1  rights in response to that question?
2      A  Yes.
3      Q  Did you ever discuss stock trading or stocks with
4  Mr. Hito?
5          MR. KIRKE:  I direct my client to assert his Fifth
6  Amendment right.
7          BY MR. FARNHAM:
8      Q  And Mr. Kara, would you assert your Fifth Amendment
9  rights in response to that question?
10     A  Yes.
11     Q  Did you ever tell Mr. Hito that he should open a
12  brokerage account?
13         MR. KIRKE:  I direct my client to assert his Fifth
14  Amendment right.
15         BY MR. FARNHAM:
16     Q  And Mr. Kara, would you assert your Fifth Amendment
17  rights in response to that question?
18     A  Yes.
19     Q  If I ask you any other questions about Mr. Hito or
20  your relationship with Mr. Hito, will you assert your Fifth
21  Amendment right against self-incrimination?
22     A  Yes.
23     Q  Who is Emil Jilwan?
24     A  He is a very good friend of mine.
25     Q  How long have you known Mr. Jilwan?

46

1          MR. KIRKE:  I direct my client to assert his Fifth
2  Amendment right.
3          BY MR. FARNHAM:
4      Q  And Mr. Kara, would you assert your Fifth Amendment
5  rights in response to that question?
6      A  Yes.
7      Q  How often do you speak to Mr. Jilwan?
8          MR. KIRKE:  I direct my client to assert his Fifth
9  Amendment right.
10         BY MR. FARNHAM:
11     Q  And Mr. Kara, do you assert that right?
12     A  Yes.
13     Q  And where does Mr. Jilwan live?
14         MR. KIRKE:  I direct my client to assert his Fifth
15  Amendment right.
16         BY MR. FARNHAM:
17     Q  And Mr. Kara, do you assert your Fifth Amendment
18  rights in response to that question?
19     A  Yes.
20     Q  Have you ever discussed stock trades or investing
21  with Mr. Jilwan?
22         MR. KIRKE:  I direct my client to assert his Fifth
23  Amendment right.
24         BY MR. FARNHAM:
25     Q  And Mr. Kara, do you assert that right?

47

1      A  Yes.
2      Q  If I ask you any other questions about Emil Jilwan,
3  will you assert your Fifth Amendment right against
4  self-incrimination?
5      A  Yes.
6      Q  Who is Joseph Azar, A-z-a-r?
7      A  He s a very good friend of mine.
8      Q  And how long have you known Mr. Azar?
9          MR. KIRKE:  I direct my client to assert his Fifth
10  Amendment right.
11         BY MR. FARNHAM:
12     Q  And Mr. Kara, do you assert your Fifth Amendment
13  rights in response to that question?
14     A  Yes.
15     Q  How often do you speak to Mr. Azar?
16         MR. KIRKE:  I direct my client to assert his Fifth
17  Amendment right.
18         BY MR. FARNHAM:
19     Q  And Mr. Kara, would you assert your Fifth Amendment
20  rights in response to that question?
21     A  Yes.
22     Q  If I ask you any other questions about Joseph Azar,
23  will you assert your Fifth Amendment against self-
24  incrimination?
25     A  Yes.

48

1      Q  When did you first start making stock trades or
2  investing in the stock market?
3          MR. KIRKE:  I direct my client to assert his Fifth
4  Amendment right.
5          BY MR. FARNHAM:
6      Q  And Mr. Kara, would you assert your Fifth Amendment
7  rights in response to that question?
8      A  Yes.
9      Q  Did your mother, ████ Kara, know that you were
10  active in the stock market?
11         MR. KIRKE:  I direct my client to assert his Fifth
12  Amendment right.
13         BY MR. FARNHAM:
14     Q  And Mr. Kara, would you assert your Fifth Amendment
15  rights in response to that question?
16     A  Yes.
17     Q  Who else did you discuss stock trading or investing
18  with?
19         MR. KIRKE:  I direct my client to assert his Fifth
20  Amendment right.
21         BY MR. FARNHAM:
22     Q  And Mr. Kara, would you assert your Fifth Amendment
23  rights in response to that question?
24     A  Yes.
25     Q  If I ask you any other questions about when you

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

49

1 started stock trading or your stock trading background or
2 experience, will you assert your Fifth Amendment against
3 self-incrimination?
4      A   Yes.
5      Q   Did you purchase Andrx Corporation, A-n-d-r-x
6 securities in February-March 2006?
7          MR. KIRKE:  I direct my client to assert his Fifth
8 Amendment right.
9          BY MR. FARNHAM:
10     Q   And Mr. Kara, would you assert your Fifth Amendment
11 rights in response to that question?
12     A   Yes.
13     Q   What was the basis for your decision to purchase
14 Andrx Corporation securities?
15         MR. KIRKE:  I direct my client to assert his Fifth
16 Amendment right.
17         BY MR. FARNHAM:
18     Q   And Mr. Kara, do you assert that right?
19     A   Yes.
20     Q   Did you make trades in Andrx securities in accounts
21 in the names of people other than yourself?
22         MR. KIRKE:  I direct my client to assert his Fifth
23 Amendment right.
24         BY MR. FARNHAM:
25     Q   And Mr. Kara, would you assert your Fifth Amendment

51

1      A   Yes.
2      Q   Were you aware that any information provided by
3 Maher Kara breached duties of confidentiality he owed to his
4 employer and companies advised by him or his employer?
5          MR. KIRKE:  Objection. I direct my client to assert
6 his Fifth Amendment right.
7          BY MR. FARNHAM:
8      Q   And Mr. Kara, would you assert your Fifth Amendment
9 rights in response to that question?
10     A   Yes.
11     Q   If I ask you any other questions about your trading
12 in Andrx Corporation securities, will you assert your Fifth
13 Amendment against self-incrimination?
14     A   Yes.
15     Q   If I ask you any other questions about information
16 you might have had or obtained about Andrx Corporation, prior
17 to making those trades, will you assert your Fifth Amendment
18 right against self-incrimination?
19     A   Yes.
20     Q   Did you purchase securities in the company  United
21 Surgical Partners International?
22         MR. KIRKE:  I direct my client to assert his Fifth
23 Amendment right.
24         BY MR. FARNHAM:
25     Q   And Mr. Kara, would you assert your Fifth Amendment

50

1 rights in response to that question?
2      A   Yes.
3      Q   And did you advise or recommend that anyone else
4 purchase Andrx Corporation securities?
5          MR. KIRKE:  I direct my client to assert his Fifth
6 Amendment right.
7          BY MR. FARNHAM:
8      Q   And Mr. Kara, do you assert your Fifth Amendment
9 right?
10     A   Yes.
11     Q   And did you discuss Andrx Corporation with anyone?
12         MR. KIRKE:  I direct my client to assert his Fifth
13 Amendment right.
14         BY MR. FARNHAM:
15     Q   And Mr. Kara, would you assert your Fifth Amendment
16 right?
17     A   Yes.
18     Q   Did you receive any information about Andrx
19 Corporation from Maher Kara prior to making the trades in the
20 Andrx securities?
21         MR. KIRKE:  I direct my client to assert his Fifth
22 Amendment right.
23         BY MR. FARNHAM:
24     Q   And Mr. Kara, do you assert your Fifth Amendment
25 rights?

52

1 rights in response to that question?
2      A   Yes.
3      Q   What was the basis for your decision to purchase
4 securities in United Surgical Partners?
5      A   I think I saw an article in Forbes Magazine about
6 this.
7          MR. KIRKE:  I direct my client to assert his Fifth
8 Amendment right.
9          BY MR. FARNHAM:
10     Q   What did the article say?
11         MR. KIRKE:  I direct my client to assert his Fifth
12 Amendment right.
13         BY MR. FARNHAM:
14     Q   And Mr. Kara, do you assert that right in response
15 to that question?
16     A   Yes.
17     Q   Was there any other basis or information you had
18 that caused you to purchase securities in United Surgical
19 Partners?
20         MR. KIRKE:  I direct my client to assert his Fifth
21 Amendment right.
22         BY MR. FARNHAM:
23     Q   And Mr. Kara, would you assert your Fifth Amendment
24 rights in response to that question?
25     A   Yes.

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

53

1  Q  Did you make any trades in United Surgical
2  Partners securities, in accounts in the names of people other
3  than yourself?
4      MR. KIRKE:  I direct my client to assert his Fifth
5  Amendment right.
6      BY MR. FARNHAM:
7  Q  And Mr. Kara, would you respond to that question by
8  asserting your Fifth Amendment right?
9  A  Yes.
10  Q  Did you advise or recommend to anyone else that
11  they purchase United Surgical Partners securities?
12      MR. KIRKE:  I direct my client to assert his Fifth
13  Amendment right.
14      BY MR. FARNHAM:
15  Q  And Mr. Kara, do you assert your Fifth Amendment
16  rights in response to that question?
17  A  Yes.
18  Q  Did you discuss United Surgical Partners with
19  anyone else?
20      MR. KIRKE:  I direct my client to assert his Fifth
21  Amendment right.
22      BY MR. FARNHAM:
23  Q  And Mr. Kara, do you respond to that question by
24  asserting your Fifth Amendment right?
25  A  Yes.

54

1  Q  I'd like to just repeat the warning that I had
2  stated earlier.
3      I want to say that, I'm not authorized to compel
4  you to give evidence or testimony as to which you assert your
5  privilege against self-incrimination, and I have no intention
6  of doing so. In addition, I do not have the authority to
7  compel your testimony by granting you immunity from
8  prosecution. So, all the questions that I'm asking today
9  will be with the understanding that if you wish to assert
10  your privilege, you must state that, but that if you do
11  answer any questions, you will be doing so voluntarily.
12      Any questions about that?
13  A  No.
14  Q  Did you receive any information about United
15  Surgical Partners from Maher Kara, prior to making the trades
16  in United Surgical Partners securities?
17      MR. KIRKE:  I direct my client to assert his Fifth
18  Amendment right.
19      BY MR. FARNHAM:
20  Q  And Mr. Kara, would you assert your Fifth Amendment
21  rights in response to that question?
22  A  Yes.
23  Q  Did Maher Kara tell you that United Surgical
24  Partners may be involved in an acquisition or merger?
25      MR. KIRKE:  I direct my client to assert his Fifth

55

1  Amendment right.
2      BY MR. FARNHAM:
3  Q  And Mr. Kara, do you assert that right in response
4  to that question?
5  A  Yes.
6  Q  And were you aware that any information provided by
7  Maher Kara breached duties of confidentiality he owed to his
8  employer, and companies advised by him or his employer?
9      MR. KIRKE:  I direct my client to assert his Fifth
10  Amendment right.
11      BY MR. FARNHAM:
12  Q  And Mr. Kara, do you assert your Fifth Amendment
13  right in response to that question?
14  A  Yes.
15  Q  Do you recall the date of the article in Forbes
16  that you saw on United Surgical Partners?
17      MR. KIRKE:  I direct my client to assert his Fifth
18  Amendment right.
19      BY MR. FARNHAM:
20  Q  And Mr. Kara, do you assert your Fifth Amendment
21  rights in response to that question?
22  A  Yes.
23  Q  If I ask you any other questions about the basis
24  for your decision to purchase United Surgical Partners
25  securities, will you assert your Fifth Amendment against

56

1  self-incrimination?
2  A  Yes.
3  Q  And if I ask you any other questions about trading
4  in United Surgical Partners, will you assert your Fifth
5  Amendment against self-incrimination?
6  A  Yes.
7  Q  If I ask you any other questions about
8  conversations you had with anyone regarding United Surgical
9  Partners, will you assert your Fifth Amendment against
10  self-incrimination?
11  A  Yes.
12  Q  Did you purchase Biosite Incorporated securities in
13  March 2007?
14      MR. KIRKE:  I direct my client to assert his Fifth
15  Amendment right.
16      BY MR. FARNHAM:
17  Q  And Mr. Kara, do you assert your Fifth Amendment
18  rights in response to that question?
19  A  Yes.
20  Q  What was the basis for your decision to purchase
21  Biosite securities?
22      MR. KIRKE:  I direct my client to assert his Fifth
23  Amendment right.
24      BY MR. FARNHAM:
25  Q  And Mr. Kara, do you assert your Fifth Amendment

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

57

1  right?
2      A   Yes.
3      Q   Did you make trades in Biosite securities in
4  accounts in the names of people other than yourself?
5          MR. KIRKE:  I direct my client to assert his Fifth
6  Amendment right.
7  BY MR. FARNHAM:
8      Q   And Mr. Kara, do you assert that right?
9      A   Yes.
10     Q   Did you advise or recommend that anyone else
11  purchase Biosite securities?
12         MR. KIRKE:  I direct my client to assert his Fifth
13  Amendment right.
14  BY MR. FARNHAM:
15     Q   And Mr. Kara, do you assert that right?
16     A   Yes.
17     Q   Did you discuss Biosite Incorporated with anyone?
18         MR. KIRKE:  I direct my client to assert his Fifth
19  Amendment right.
20  BY MR. FARNHAM:
21     Q   And Mr. Kara, do you assert that right?
22     A   Yes.
23     Q   Did you receive any information regarding Biosite
24  from Maher Kara prior to making trades in Biosite securities
25  or advising others to purchase Biosite securities?

---

58

1          MR. KIRKE:  I direct my client to assert his Fifth
2  Amendment right.
3  BY MR. FARNHAM:
4      Q   And Mr. Kara, do you assert that right?
5      A   Yes.
6      Q   Did Maher Kara tell you that Biosite may be
7  involved in an acquisition or merger?
8          MR. KIRKE:  I direct my client to assert his Fifth
9  Amendment right.
10  BY MR. FARNHAM:
11     Q   And Mr. Kara, do you assert that right?
12     A   Yes.
13     Q   Were you aware that any information provided by
14  Maher Kara, regarding Biosite, breached duties of
15  confidentiality he owed to his employer and companies advised
16  by him or his employer?
17         MR. KIRKE:  I direct my client to assert his Fifth
18  Amendment right.
19  BY MR. FARNHAM:
20     Q   And Mr. Kara, do you assert your Fifth Amendment
21  right against self-incrimination in response to that
22  question?
23     A   Yes.
24     Q   If I ask you any other questions about your trading
25  in Biosite Inc., will you assert your Fifth Amendment against

---

59

1  self-incrimination?
2      A   Yes.
3      Q   If I ask you any other questions about
4  conversations you had with anyone regarding Biosite, will you
5  assert your Fifth Amendment against self-incrimination?
6      A   Yes.
7      Q   Do you own any homes or real estate other than your
8  current home?
9          MR. KIRKE:  I direct my client to assert his Fifth
10  Amendment right.
11  BY MR. FARNHAM:
12     Q   And Mr. Kara, do you assert that right?
13     A   Yes.
14     Q   Do you own a company Applied Remedial Services?
15     A   With my wife.
16     Q   You and your wife own that company?
17     A   Yes.
18     Q   And do you have an ownership interest in any other
19  companies or entities?
20         MR. KIRKE:  I direct my client to assert his Fifth
21  Amendment right.
22  BY MR. FARNHAM:
23     Q   And Mr. Kara, do you assert that right?
24     A   Yes.
25     Q   Do you have an ownership interest in any

---

60

1  partnerships or business ventures?
2          MR. KIRKE:  I direct my client to assert his Fifth
3  Amendment right.
4  BY MR. FARNHAM:
5      Q   And Mr. Kara, do you assert that right?
6      A   Yes.
7      Q   Do you own any cars?
8      A   Yes.
9      Q   What are the cars you own?
10     A   Range Rover, and a Mercedes.
11     Q   What year is the Range Rover?
12     A   2006.
13     Q   And is that -- is there a loan for that or is it
14  leased?
15     A   No.
16     Q   You own that car?
17     A   Yeah.
18     Q   And there s no payments or loans?
19     A   No.
20     Q   What year is the Mercedes?
21     A   2004.
22     Q   And is there a lease or a loan on that car?
23     A   No.
24     Q   What model is it?
25     A   500E.

REDACTED

---

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

**61**

```
 1   Q   Any other cars that you or your wife own?
 2   A   Yeah, an F150 Ford, 2007.
 3   Q   And is there a lease or a loan related to that car?
 4   A   No.
 5   Q   And is that owned by you personally?
 6   A   The company .
 7   Q   Applied Remedial Services?
 8   A   Yeah.
 9   Q   And how about the Range Rover and the Mercedes, are
10   those in your name or the name of the company?
11   A   Mariam, I think owns the Range Rover, and the
12   Mercedes I own.
13   Q   Any other cars that you own?
14   A   No.
15   Q   Any other vehicles that you own?
16   A   No.
17   Q   Any assets that you or your wife own other than
18   homes and real estate that I asked you about, or vehicles?
19       MR. KIRKE:  I direct my client to assert his Fifth
20   Amendment right.
21       BY MR. FARNHAM:
22   Q   And Mr. Kara, would you assert your Fifth Amendment
23   rights in response to that question?
24   A   Yes.
25   Q   Do you have any cash assets?
```

**62**

```
 1       MR. KIRKE:  I direct my client to assert his Fifth
 2   Amendment right.
 3       BY MR. FARNHAM:
 4   Q   And Mr. Kara, would you assert your Fifth Amendment
 5   rights in response to that question?
 6   A   Yes.
 7   Q   Do you have any funds or assets that are being kept
 8   for your benefit by someone else?
 9       MR. KIRKE:  I direct my client to assert his Fifth
10   Amendment right.
11       THE WITNESS:  No.
12       BY MR. FARNHAM:
13   Q   And Mr. Kara, do you assert that right?
14   A   Yes.
15   Q   Do you have computers in your home?
16   A   Yeah.
17   Q   How many and where are they located?
18   A   One on my desk, one on Mariam s desk.
19   Q   Are those both in the office space?
20   A   Office, yeah.
21   Q   Any other computers?
22   A   Yeah, one on ████████desk in her bedroom, and then
23   ████████has his laptop and ████has her laptop.
24   Q   Which of those computers do you use?
25   A   Only my own.
```

**63**

```
 1   Q   Do you ever use your wife s computer?
 2   A   Never.
 3   Q   And do you use the computer, your computer in your
 4   office, to make securities trades?
 5   A   Yeah.
 6       MR. KIRKE:  I direct my client to assert his Fifth
 7   Amendment right.
 8       BY MR. FARNHAM:
 9   Q   And Mr. Kara, would you assert your Fifth Amendment
10   rights in response to that question?
11   A   Yes.
12   Q   Does your wife ever use your computer?
13   A   No.
14   Q   She uses her own computer?
15   A   Yes.
16   Q   Are the computers password protected in any way?
17       MR. KIRKE:  You can answer.
18       THE WITNESS:  No.  Mine is just thumb protected.
19       BY MR. FARNHAM:
20   Q   So, it has a device that reads your fingerprint?
21   A   Yes.
22   Q   And do you do that every time you want to log into
23   it?
24   A   No.  Only when it s shutdown.
25   Q   Do you shut it down at the end of each day?
```

**64**

```
 1   A   No, I don t, it shuts down by itself.
 2   Q   Okay.  At the end of each day or --
 3   A   Only when it upkeeps itself, only when it -- what s
 4   the proper word?
 5   Q   Like update?
 6   A   Thank you.
 7   Q   Okay.  When the computer updates it shuts down?
 8   A   Yes.
 9   Q   And then you need to restart it with a thumb print?
10   A   Yes.
11   Q   Is that an every day occurrence?
12   A   Every couple of days or so.
13   Q   And will it react to your wife s or your son s
14   thumb print?
15   A   No.
16   Q   Other than that thumb print that s required, or
17   thumb scan that s required when you turn the computer on, is
18   there any other password protection on it?
19   A   No.
20   Q   Do you know whether your wife ever uses your
21   computer when you re not there?
22   A   No, she doesn t use it.
23   Q   How about ████████?
24   A   No.
25   Q   What kind of computer is it that you use?
```

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

65

1    A  It s a Dell.
2    Q  with Windows on it?
3    A  Yeah.
4    Q  Did you purchase securities of a company called
5  Alexion Pharmaceuticals?
6        MR. KIRKE:  I direct my client to assert his Fifth
7  Amendment right.
8        BY MR. FARNHAM:
9    Q  And Mr. Kara, do you assert that right?
10   A  Yes.
11   Q  Did you discuss Alexion Pharmaceuticals or its
12  securities with anyone else?
13       MR. KIRKE:  I direct my client to assert his Fifth
14  Amendment right.
15       BY MR. FARNHAM:
16   Q  And Mr. Kara, would you assert your Fifth Amendment
17  rights in response to that question?
18   A  Yes.
19   Q  If I ask you any other questions about Alexion
20  Pharmaceuticals or its securities, will you assert your Fifth
21  Amendment against self-incrimination?
22   A  Yes.
23   Q  If I ask you any other questions about
24  conversations you had with anyone regarding Alexion, will you
25  assert your Fifth Amendment against self-incrimination?

66

1    A  Yes.
2    Q  Did you purchase securities in a company called
3  Amylin Pharmaceuticals, A-m-y-l-i-n?
4        MR. KIRKE:  I direct my client to assert his Fifth
5  Amendment right.
6        BY MR. FARNHAM:
7    Q  And Mr. Kara, do you assert that right?
8    A  Yes.
9    Q  Did you discuss Amylin Pharmaceuticals or its
10  securities with anyone else?
11       MR. KIRKE:  I direct my client to assert his Fifth
12  Amendment right.
13       BY MR. FARNHAM:
14   Q  And Mr. Kara, do you assert that right?
15   A  Yes.
16   Q  If I ask you any other questions about trading or
17  securities of Amylin Pharmaceuticals, will you assert your
18  Fifth Amendment against self-incrimination?
19   A  Yes.
20   Q  If I ask you any other questions about
21  conversations you had with anyone regarding Amylin
22  Pharmaceuticals, will you assert your Fifth Amendment against
23  self-incrimination?
24   A  Yes.
25   Q  Did you purchase securities in a company called

67

1  Biogen, B-i-o-g-e-n?
2        MR. KIRKE:  I direct my client to assert his Fifth
3  Amendment right.
4        BY MR. FARNHAM:
5    Q  And Mr. Kara, do you assert that right?
6    A  Yes.
7    Q  Did you have discussions with anyone regarding
8  Biogen?
9        MR. KIRKE:  I direct my client to assert his Fifth
10  Amendment right.
11       BY MR. FARNHAM:
12   Q  And Mr. Kara, do you assert that right?
13   A  Yes.
14   Q  If I ask you any other questions about Biogen or
15  its securities, will you assert your Fifth Amendment against
16  self-incrimination?
17   A  Yes.
18   Q  And if I ask you any other questions about
19  conversations you had with anyone regarding Biogen, will you
20  assert your Fifth Amendment against self-incrimination?
21   A  Yes.
22   Q  Did you purchase securities of a company called
23  Celgene.
24       MR. KIRKE:  I direct my client to assert his Fifth
25  Amendment right.

68

1        MR. FARNHAM:  C-e-l-g-e-n-e.
2        BY MR. FARNHAM:
3    Q  And Mr. Kara, in response to that question would
4  you assert your Fifth Amendment right?
5    A  Yes.
6    Q  Did you have any discussions with anyone regarding
7  celgene?
8        MR. KIRKE:  I direct my client to assert his Fifth
9  Amendment right.
10       BY MR. FARNHAM:
11   Q  And Mr. Kara, would you respond by asserting your
12  Fifth Amendment right.
13   A  Yes.
14   Q  If I ask you any other questions about Celgene or
15  its securities, will you assert your Fifth Amendment against
16  self-incrimination?
17   A  Yes.
18   Q  If I ask you any other questions about
19  conversations you had with anyone regarding Celgene, will you
20  assert your Fifth Amendment against self-incrimination?
21   A  Yes.
22   Q  Did you purchase securities of a company called HCA
23  Inc.?
24       MR. KIRKE:  I direct my client to assert his Fifth
25  Amendment right.

REDACTED

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

---

69

1       BY MR. FARNHAM:
2     Q   And Mr. Kara, would you assert your Fifth Amendment
3   rights in response to that question?
4     A   Yes.
5     Q   Did you have any conversations with anyone
6   regarding HCA Inc.?
7       MR. KIRKE:  I direct my client to assert his Fifth
8   Amendment right.
9       BY MR. FARNHAM:
10    Q   And Mr. Kara, do you assert that right?
11    A   Yes.
12    Q   If I ask you any other questions about HCA, Inc.,
13  will you assert your Fifth Amendment against self-
14  incrimination?
15    A   Yes.
16    Q   If I ask you any other questions about
17  conversations you had with anyone regarding HCA, Inc., will
18  you assert your Fifth Amendment against self-incrimination?
19    A   Yes.
20    Q   What other companies have you purchased the
21  securities for in the last three years?
22      MR. KIRKE:  I direct my client to assert his Fifth
23  Amendment right.
24      BY MR. FARNHAM:
25    Q   And Mr. Kara, would you assert your Fifth Amendment

---

70

1   rights in response to that?
2     A   Yes.
3     Q   If I ask you any other questions about your stock
4   trading, will you assert your Fifth Amendment against
5   self-incrimination?
6     A   Yes.
7     Q   If I ask you which companies you invested in and
8   which companies you purchased securities in, will you assert
9   your Fifth Amendment against self-incrimination?
10    A   Yes.
11    Q   If I ask you for the reasons that you made any of
12  those trades, will you also assert your Fifth Amendment
13  against self-incrimination?
14    A   Yes.
15      MR. FARNHAM:  Let s go off the record.
16      (off the record.)
17      MR. FARNHAM:  Back on the record.  It s 11:40 a.m.
18      BY MR. FARNHAM:
19    Q   Mr. Kara I d like to ask you to look at what s been
20  marked as Exhibit 47, it s a multiple page document that s
21  marked with numbers MIKARA1293 through 1300.  And I ll give
22  you as long as you d like to look that over.  Do you
23  recognize the pages in Exhibit 47?
24      (SEC Exhibit No. 47 was
25      marked for identification.)

---

71

1       MR. KIRKE:  I direct my client to assert his Fifth
2   Amendment right.
3       BY MR. FARNHAM:
4     Q   And Mr. Kara, do you assert your Fifth Amendment
5   rights in response to that question?
6     A   Yes.
7     Q   Were these pages that you either provided to your
8   counsel or produced to the securities and Exchange
9   Commission?
10      MR. KIRKE:  I direct my client to assert his Fifth
11  Amendment right.
12      BY MR. FARNHAM:
13    Q   And Mr. Kara, would you assert your Fifth Amendment
14  rights in response to that question?
15    A   Yes.
16    Q   When did you obtain these pages?
17      MR. KIRKE:  I direct my client to assert his Fifth
18  Amendment right.
19      BY MR. FARNHAM:
20    Q   And Mr. Kara, do you assert your Fifth Amendment
21  rights on the grounds that a truthful response may
22  incriminate you?
23    A   Yes.
24    Q   And did you provide any of the pages in Exhibit 46
25  -- 47, I m sorry -- Exhibit 47, did you provide any of those

---

72

1   pages to anyone else?
2       MR. KIRKE:  I direct my client to assert his Fifth
3   Amendment right.
4       BY MR. FARNHAM:
5     Q   And Mr. Kara, do you assert your Fifth Amendment
6   right against self-incrimination in response to that
7   question?
8     A   Yes.
9     Q   Did you print these pages after you made the trades
10  in the Biosite securities?
11      MR. KIRKE:  I direct my client to assert his Fifth
12  Amendment right.
13      BY MR. FARNHAM:
14    Q   And Mr. Kara, do you assert your Fifth Amendment
15  rights in response to that question?
16    A   Yes.
17    Q   Did you print out the pages that are in Exhibit 47
18  after you were contacted by the securities and Exchange
19  Commission?
20      MR. KIRKE:  I direct my client to assert his Fifth
21  Amendment right.
22      BY MR. FARNHAM:
23    Q   And Mr. Kara, would you assert your Fifth Amendment
24  rights in response to that question?
25    A   Yes.

REDACTED

---

SEC - United Surgical Partners - Michael F. Kara - 8/1/2008

73

1    Q   If I ask you any other questions about Exhibit 47,
2   will you assert your Fifth Amendment against self-
3   incrimination?
4    A   Yes.
5    Q   Who is ▓▓▓▓▓▓▓▓?
6    A   ▓▓▓▓▓▓▓ is a very old friend of my father,
7   god bless his soul.
8    Q   Where does ▓▓▓▓▓▓ live?
9    A   He lives in Los Altos.
10    Q   Have you ever loaned money to Mr. ▓▓▓▓?
11        MR. KIRKE:   I direct my client to assert his Fifth
12   Amendment right.
13        BY MR. FARNHAM:
14    Q   And Mr. Kara, would you assert your Fifth Amendment
15   rights in response to that question?
16    A   Yes.
17    Q   Has Mr. Michael ever loaned money to you?
18        MR. KIRKE:   I direct my client to assert his Fifth
19   Amendment right.
20        BY MR. FARNHAM:
21    Q   And Mr. Kara, would you assert your Fifth Amendment
22   rights in response to that question?
23    A   Yes.
24    Q   If I ask you any other questions about ▓▓▓▓▓
25   ▓▓▓▓▓ will you assert your Fifth Amendment against self-

74

1   incrimination?
2    A   Yes.
3        MR. FARNHAM:   Mr. Kara, I have no further questions
4   at this time.   You may, however, be called again to testify
5   in this investigation, and if it s necessary, I ll contact
6   your counsel.
7        Mr. Kara, do you have anything you want to add to
8   clarify any statements, or to add to statements you ve made
9   today?
10        THE WITNESS:   No, sir.
11        MR. FARNHAM:   And Mr. Kirke, do you wish to ask any
12   clarifying questions?
13        MR. KIRKE:   No, thank you.
14        MR. FARNHAM:   We can go off the record, it s 11:45
15   on August 1st.
16        (Thereupon, at 11:45 a.m. the testimony was
17   concluded.)
18        --o0o--
19
20
21
22
23
24
25

75

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
REPORTER S CERTIFICATE

     I Richard Friant, reporter, hereby verify that the
foregoing transcript of 74 pages is a complete, true and
accurate transcript of the testimony indicated, held on
Friday, August 1, 2008, at 44 Montgomery Street, Suite 2600,
San Francisco, California, in the matter of: United Surgical
Partners International, Inc. and Biosite,Inc.   I further
certify that this proceeding was recorded by me and that the
foregoing transcript was prepared by Maryann Loverro under my
direction.
       Date:
       Official Reporter:
       Diversified Reporting Services, Inc.
         Diversified Reporting Services, Inc.
       Phone: (202)467-9200 Fax: (202)296-9220

76

PROOFREADER S CERTIFICATE
In the Matter of:   United Surgical Partners International,
Inc., and Biosite Inc.
Witness:   Michael Kara
File Number:   SF-03247
Date:   Friday, August 1, 2008
Location:   San Francisco, California
     This is to certify that I, Maryann Loverro, do
hereby swear and affirm that the attached proceedings before
the U.S. Securities and Exchange Commission were held
according to the record and that this is the original,
complete, true and accurate transcript that has been compared
to the reporting or recording accomplished at the hearing.

REDACTED