UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICHAEL F. KARA, et al.,<br><br>    Defendants. | Case No. 09-cv-01880-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 152 |

## I.  INTRODUCTION

The Securities and Exchange Commission ("SEC"), filed the instant suit against Michael Kara ("Defendant"), alleging Defendant was involved in an insider trading scheme whereby Defendant used material nonpublic information provided to him by his brother, Maher Kara ("Maher"), to purchase securities in Andrx Corporation ("Andrx") and Biosite, Inc. ("Biosite"). The SEC has moved for summary judgment on the claim for securities fraud under Section 10(b) and 14(e) of the Securities Exchange Act of 1934 and Rule 14e-3. The SEC seeks the civil remedies of disgorgement, prejudgment interest, civil penalties, and an injunction. The only issue in dispute is whether Defendant should be ordered to pay disgorgement, prejudgment interest, and civil penalties. Having considered the parties' briefs, accompanying exhibits and oral arguments, the Court hereby makes the following rulings:

(1) The Court finds Defendant civilly liable of securities fraud and **GRANTS** the SEC's request for an injunction against Defendant.

(2) The Court **GRANTS** the SEC's request for disgorgement and prejudgment interest. Defendant is ordered to pay $424,988 in disgorgement. The SEC is to submit

1  supplemental briefing within seven (7) days with the calculation for prejudgment
2  interest for the dates discussed below.
3  (3) The Court **DENIES** the SEC's request for civil penalties.

## II.  BACKGROUND

The facts of this case contained in the SEC's Amended Complaint (Docket No. 62) are not in dispute. The SEC complaint parallels the prosecution's case in *U.S. v. Mounir Fayez Kara (aka Michael Kara)*, Case No. 3:09-cr-00417-EMC, wherein Defendant was convicted of securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and conspiracy to commit conspiracy fraud.

According to the SEC complaint, from 1998 to 2007, Citigroup employed Maher as an investment banker. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 9; Docket No. 62 (SEC's Amended Complaint) ("FAC") ¶ 20. In 2002, Maher began specializing in healthcare companies and in 2005, was promoted to Director in the Healthcare Group of Citigroup's Investment Banking Division. *See* Docket No. 157 (Request for Judicial Notice) (RJN)[1], Exh. 2; FAC ¶ 20. Maher learned about upcoming confidential transactions through his position at Citigroup, including through discussions with colleagues, exchanges between investment bankers in the Healthcare Group, and advising Citigroup clients. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 9; FAC ¶ 21. Maher and Citigroup senior bankers within the Healthcare Group

---

[1] The SEC requests judicial notice of : (1) Defendant's Indictment in his criminal case; (2) Defendant's Plea Agreement in his criminal case; (3) Defendant's Transcript of the Plea Hearing in his criminal case; (4) the Amended Judgment in the criminal case; (5) the Final Order of Forfeiture Order; (6) the Deferred Prosecution Agreement in Emile Jilwan's criminal case; (7) the Indictment of Bassam Salman; (8) the Amended Judgment in the criminal case against Bassam Salman; (9) the Transcript of the Trial Proceedings against Bassam Salman; (10) the phone records of Bassam Salman; (11) the Indictment of Karim Bayyouk; and (12) the Transcript of the Trial Proceedings against Karim Bayyouk. RJN at 2-3.

Under the Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the court's territorial jurisdiction; or (2) can be accurately and readily determined from sources who accuracy cannot reasonably be questioned. Fed. R. Evid. 201." The Court may take judicial notice of undisputed matters of public record, *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), including documents on file in federal or state courts. *See Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002). Here, Kara does not dispute the accuracy of the documents, which are all readily verifiable documents filed in this district. Judicial notice is therefore proper.

discussed pending projects and other work tasks at biweekly meetings. FAC ¶ 23. Each person in the group was subject to confidentiality obligations preventing the misuse or discussing the information with non-employees. RJN, Exh. 1 ¶ 6; FAC ¶ 23. As an employee of Citigroup, Maher knew the restrictions on confidential information and Citigroup's policy prohibiting him from trading in securities issued by any healthcare company. RJN, Exh. 1 ¶ 6; FAC ¶ 24. Based on Citigroup's employee policies, Maher had a duty to maintain the confidentiality of any information he obtained during his employment. FAC ¶ 25.

A.   Trading in Andrx Corporation Securities

In December 2005, an international drug company contacted Citigroup's Investment Banking Division seeking advice to acquire Andrx. FAC ¶ 26. The planned acquisition and discussions with Citigroup were confidential. *Id.* Maher was aware of the acquisition from communications with other Citigroup employees, discussions at meetings, and the working relationship he had with investment bankers. FAC ¶ 27.

On or before February 24, 2006, Maher breached his duty of confidentiality by tipping Defendant with material nonpublic information about the planned Andrx acquisition. FAC ¶ 30. On February 24, 2006, Defendant spent $92,735 purchasing short-term call options in Andrx. FAC ¶ 31. From February 24 to March 10, 2006, Defendant spent $150,675 purchasing Andrx call options and $14,722 purchasing 735 shares of Andrx stock resulting in profits of $396,315. *Id.*

Defendant tipped family and friends about the plan to acquire Andrx. FAC ¶ 32. On February 24, 2006, Defendant tipped his friend, Emile Jilwan, about the acquisition of Andrx. FAC ¶ 33. From February 24 to March 10, 2006, Jilwan spent $157,629 to purchase short-term Andrx call options resulting in profits of $386,010. *Id.* On February 24, 2006, Defendant tipped Bassam Salman about the Andrx acquisition who in turn tipped his business partner, Karim Bayyouk. FAC ¶ 34. From February 24 to March 10, 2006, Bayyouk spent $322,292 purchasing Andrx call options resulting in profits of $363,418. *Id.* On or before March 6, 2006, Defendant tipped his friend, Joseph Azar, with information regarding the Andrx acquisition. FAC ¶ 35. Azar spent over $123,000 to purchase 2,500 shares of Andrx stock resulting in profits of $18,473. *Id.*

3

1  On or before March 9, 2006, Defendant tipped his uncle, Zahi Haddad, with information regarding
2  the Andrx acquisition. FAC ¶ 36. Haddad spent $11,349 to purchase Andrx short-term call
3  options resulting in a profit of $10,205. *Id.*
4  The diagram below summarizes the insider trading scheme in Andrx stocks and options.



B. <u>Trading in Biosite, Inc. Securities</u>

On March 5, 2007, bankers from Citigroup's Investment Banking Healthcare Group learned that its client, Beckman Coulter Inc. ("Beckman"), was seeking financing to acquire Biosite. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 23; FAC ¶ 40. Like the Andrx acquisition, the negotiations for the acquisition of Beckman and Citigroup's involvement in the financing were confidential. FAC ¶ 41. Maher learned of the acquisition negotiations through Healthcare Group meetings, meetings of investment bankers in the Healthcare Group, and through his working relationship with employees in the Citigroup Investment Banking Healthcare Group. FAC ¶ 43.

4

Maher then breached his duty of confidentiality by tipping Defendant with material nonpublic information about the planned Biosite acquisition. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 23; FAC ¶ 45. On March 22 and 23, 2007, Defendant spent $154,451 to purchase 1,615 shares of stock and 435 call option contracts resulting in profits of $1,239,711. FAC ¶ 46; s*ee* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 28.

Defendant tipped friends and family about the planned acquisition of Biosite. FAC ¶ 47. On March 22, 2007, Defendant called his friend, Joseph Azar, and told him about the plan to acquire Biosite. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 26; FAC ¶ 48. Azar spent approximately $200,000 to purchase 3,700 shares of Biosite stock resulting in potential profits of $108,525. FAC ¶ 48. Defendant tipped Bassam Salman with the Biosite information who then told Karim Bayyouk. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 25; FAC ¶ 49. Bayyouk spent $100,906 to purchase short-term call options resulting in a profit of $954,905. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 25; FAC ¶ 49. Bayyouk tipped his brother who spent $5,018 to purchase short-term Biosite stock options resulting in profits of $72,550. FAC ¶ 50. Defendant called his friend, Nasser Mardini, and provided him with information about the planned acquisition of Biosite. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 25; FAC ¶ 51. On March 23, 2007, Mardini directed a friend to order call options for him, encouraged his brother to purchase Biosite call options, and traded in another friend's account. FAC ¶ 51. The profits from the trades totaled $291,723. *Id.* On March 22, 2007, Defendant and Emile Jilwan spoke by telephone and Jilwan ordered Biosite call options in a joint account for Jilwan and his wife. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶¶ 24, 28; FAC ¶ 52. Defendant purchased Biosite stock and call options for $303,603 in a brokerage account held in Jilwan's name which Defendant had access to. FAC ¶ 52. The trades resulted in profits of $2.3 million. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 28; FAC ¶ 52. On March 23, 2007, Defendant called his uncle, Zahi Haddad, who wired $2,100 into his brokerage account and purchased Biosite call options resulting in profits of $81,725. FAC ¶ 53. Defendant placed two trades in an account held in the name of a long-time friend resulting in profits of $118,235. FAC ¶ 54. Based on the information Defendant received from Maher, Defendant made profits of more

5

1 than $1.2 million while his friends and family who he tipped made profits of more than $3.9
2 million. FAC ¶ 55.
3   The diagram below summarizes the insider trading scheme in Biosite stocks and options.



### III. DISCUSSION

A. <u>Defendant is Civilly Liable and the SEC's Request for an Injunction is Granted</u>

  The parties do not dispute that Defendant is liable for securities fraud. *See* Opp. at 2. Defendant admits that he traded on inside information and does not dispute the material facts. *Id.* Further, Defendant agrees with the SEC that the Court should enjoin him from future violations of securities laws. *Id.* Therefore, the Court finds that Defendant is liable for securities fraud and will

1    issue an injunction enjoining Defendant from future securities laws violations.

2    B.      <u>Defendant is Ordered to Pay Disgorgement in the Amount of $424,988</u>

3    "Disgorgement is an equitable remedy, imposed to force a defendant to give up the amount by which he was unjustly enriched." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). "Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *Id.*; *see also SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (explaining that disgorgement has been used to prevent wrongdoers from unjustly enriching themselves through violations). Disgorgement cannot exceed the amount by which a defendant was unjustly enriched "[b]ecause disgorgement does not serve a punitive function." *Contorinis*, 743 F.3d at 301; *see also SEC v. World Gambling Corp.*, 555 F. Supp. 930, 935 (S.D.N.Y. 1983) (disgorgement for "profit obtained" including payment of income taxes was not punitive). Disgorgement only needs to be a reasonable approximation of the profits which have been causally connected to the violation. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989). In an insider trading case, courts typically require that the violator return all the profits made on the trades. *Id.* Thus "[a] tipper can be required to disgorge his tippees' profits, whether or not the tippees themselves have been found liable." *SEC v. Clark*, 915 F.2d 439, 454 (9th Cir. 1990); *see also Contorinis*, 743 F.3d at 303 (holding that tippers may be held liable to disgorge the gains of their tippees).

Once the district court has found a federal securities law violation, the court has broad discretion in issuing a remedy, including whether or not the defendant should disgorge their profits. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). Further, the court's discretion extends to calculating the amount of disgorgement. *Id.*

Here, Defendant has admitted that he acted as both a tippee and a tipper in the insider trading scheme. *See* Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶ 8; FAC ¶¶ 30, 32-37, 45, 47-55. Maher breached his duty of confidentiality to Citigroup when he disclosed the information about the Andrx acquisition. Defendant traded in Andrx stock and call options based on the information received from Maher and made illegal profits of $395,637.37. *See* Mot. at 20. Defendant also tipped his family and friends with the information about the Andrx acquisition and

7

thus became a tipper. The SEC focuses specifically on the trades of Emile Jilwan because Defendant admitted he tipped him, the two shared control of a brokerage account in Jilwan's name, and both made trades based on the information provided by Maher. *See* Mot. at 19-20. Based on the information Jilwan received from Defendant, he purchased short-term Andrx call options resulting in profits of $378,033.61. *See* Mot. at 20.

Further, Defendant traded on Maher's information about the planned Biosite acquisition, resulting in profits of $1,240,653.40. Defendant tipped Jilwan, who purchased Biosite call options using a joint account for the benefit of Jilwan and his wife but in which Defendant had access. The resulting profits based on these trades totaled $2,307,698.30. In total, Defendant and Jilwan realized $4,322,022.68 in illegal profits from the trades in Andrx and Biosite securities. Since the purpose of disgorgement is to prevent the securities law violator from benefiting from his illegal trades, the SEC seeks disgorgement of the entire amount of illegal profits he made from the trades in Andrx and Biosite, as offset by the following amounts:

| | |
|---|---|
| $1,444,467 | Sum Jilwan paid in forfeiture from the accounts shared with Defendant |
| $1,317,087 | Full disgorgement for which Jilwan agreed he was liable in this action |
| $1,135,480 | Total amount Defendant paid in forfeiture ($396,941) and restitution ($738,539) |
| $3,897,034 | Total Credits |

After applying the credits, the SEC seeks disgorgement in the amount of $424,988 ($4,322,022.68 - 3,897,034).

Defendant argues disgorgement of $424,988 fails to take into account the payment of taxes to the IRS. *See* Docket No. 159 (Opp.) at 2, 5-6. Defendant claims he has already paid the IRS and Franchise Tax Board $573,124.80 after declaring the capital gains on the profits from the illegal trades and that if the Court ordered disgorgement, it would constitute double counting. *Id.* at 5-6. However, the payment of taxes to the IRS is a collateral matter because Defendant

8

received the ill-gotten gains first and then had to pay taxes on it. Although the taxes are related to ill-gotten gains, taxes are collateral to the illegal transactions, not an integral part of it. The collateral nature of tax liability is illustrated by the fact that the precise tax due could be affected by other financial factors (*e.g.*, other reported income, deductions, tax credits, etc.) unrelated to the ill-gotten gains. Moreover, Defendant may be entitled to obtain future tax relief from the IRS as a result of the disgorgement ordered herein. *See SEC v. Koenig*, 532 F. Supp. 2d 987, 994 (N.D. Ill. 2007) (acknowledging the possibility the defendant may obtain future tax deductions but leaving the decision for the defendant to work out with the IRS). This underscores the collateral nature of the tax payments.

It is therefore not surprising that as a general matter, the Ninth Circuit has held "'A securities law violator [may not] avoid or diminish his responsibility to return his ill-gotten gains by establishing that he is no longer in possession of such funds due to . . . forms of discretionary spending.'" *SEC v. JT Wallenbrock & Assocs.*, 440 F.3d 1109, 1135-36 (9th Cir. 2006) (quoting *SEC v. Thomas James Assocs., Inc.*, 738 F. Supp. 88, 95 (W.D.N.Y. 1990)). Other courts have also found that tax payments should not be deducted from disgorgement calculations. For example, in *SEC v. Svoboda*, the court held that "deduction of capital gains taxes from illicit trading gains was not required when determining the amount the defendant would be required to disgorge in an SEC enforcement action." 409 F. Supp. 2d 331, 345 (S.D.N.Y. 2006); *see also Koenig*, 532 F. Supp. 2d at 994 (court declined to adjust the disgorgement amount based on defendant's payment of taxes on ill-gotten gains). In *Svoboda*, the defendant was convicted of violating Section 10(b) and 14(e) of the Securities Exchange Act of 1934. *Svoboda*, 409 F. Supp. 2d at 336. The defendant challenged the disgorgement amount, arguing that the court should deduct the amount of capital gains taxes paid from the illicit trading gains. *Id.* at 345. However, the defendant cited no legal authority in support, and the court held that the disgorgement amount should not be deducted based on the taxes paid. *Id.*; *see also SEC v. Razmilovic*, 822 F. Supp. 2d 234, 277 (E.D.N.Y. 2011) ("there is no legal authority to support a deduction for taxes paid upon ill-gotten gains").

Defendant has not cited any cases supporting the proposition that the disgorgement figure

9

include deductions for previous taxes paid on illegal profits. Instead, Defendant relies on legal authority arguing that the Court must consider whether disgorgement is appropriate under the particular facts. *See* Opp. at 6. The Court finds that disgorgement in the amount of $424,988 is reasonable because Defendant engaged in an insider trading scheme in which he not only traded on the material nonpublic information provided by Maher, but also tipped his friends and family with the information about the planned acquisitions of Andrx and Biosite.

While Defendant relies on *Hateley v. SEC*, 8 F.3d 653, 655-56 (9th Cir. 1993) for the argument that courts must examine the amount actually retained by defendants and that disgorgement cannot be unreasonable and excessive to the defendant, *Hateley* is distinguishable. There, the court held that the amount of disgorgement was unreasonable because it amounted to more than ten times the amount of the defendant's unjust enrichment. *Id.* at 656. More importantly, the disgorgement ordered took into account the net proceeds received by defendant – not of finder's fees paid to the third party who was responsible for the illegal trades off the top. Those fees were indispensable, not collateral, to the illegal transaction. As discussed above, that is not true with taxes here. Taxes did not affect the amount *received* by Defendant as a result of the illegal conduct. Taxes were paid *after* the fact and were not an expense necessarily incurred in acquiring the ill-gotten gain.

In sum, the disgorgement amount of $424,988 is reasonable because Defendant's insider trading scheme lasted two years and resulted in profits of $4,322,022 and the SEC has credited Defendant for payments made by both himself and Jilwan. No credit is due for taxes paid.

C.    Prejudgment Interest is not Ordered

Defendant also contests the amount sought by the SEC for prejudgment interest. *See* Opp. at 2. "Prejudgment interest on a disgorgement amount is intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." *Contorinis*, 743 F.3d at 308. "[Prejudgment] interest is given in response to considerations of fairness." *Blau v. Lehman*, 368 U.S. 403, 414 (1962). While "the amount on which a violator must pay prejudgment interest usually tracks the amount that the party is ordered to disgorge," *Contorinis*, 743 F.3d at 308, in this case, once the taxes were paid on the

10

1  ill-gotten gains, Defendant no longer had use of the money in question. In view of this fact and
2  the substantial forfeiture, restitution and fine ordered by this Court, the Court in the exercise of its
3  discretion concludes that prejudgment interest should not be paid past the date taxes were paid by
4  Defendant.

5      The Court orders Defendant to pay prejudgment interest for the period he had possession
6  of the ill-gotten gain up to the date taxes were paid (on October 14, 2008). The SEC shall
7  calculate such amount.

8  D.    <u>The SEC's Motion for Summary Judgment on the Claim for Civil Penalties is Denied</u>

9      The Court may impose civil penalties for insider trader violations under 15 U.S.C. § 78u-1
10  (2012). The statute states:

> The amount of the penalty which may be imposed on the person who committed such violation shall be determined by the court in light of the facts and circumstances, but shall not exceed three times the profit gain or loss avoided as a result of such unlawful purchase, sale, or communication.

15 U.S.C. § 78u-1(a)(2). "Civil penalties are designed to punish the individual violator and deter future violations of the securities law." *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007).

> In determining if civil penalties should be imposed, the courts look at factors including: 1) the egregiousness of the defendant's conduct; 2) the degree of the defendant's scienter; 3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; 4) whether the defendant's conduct was isolated or recurrent; and 5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Id.* at 329.

    The Court denies the SEC's request for civil penalties. To be sure, Defendant's conduct was egregious because Defendant engaged in the insider trading scheme for about three years which netted him profits of more than $4 million. *See Svoboda*, 409 F. Supp. 2d at 347 (imposing civil penalties because defendant violated securities laws, made a profit of $219,100, possessed a high degree of scienter, and the scheme lasted for four years). Moreover, Defendant did not fully

11

1   and quickly cooperate with the investigation; instead he first misled the SEC about the source of
2   his Biosite information stating that he learned about it from the Yahoo Financial website. *See*
3   Case No. 3:09-cr-00417-EMC, Docket No. 234 ¶¶ 30-31, 34. Defendant evinced a high degree of
4   scienter because he not only traded on the confidential information provided to him by his brother
5   but tipped five others. He caused a substantial loss to the economic markets. *See Opulentica,*
6   *LLC*, 479 F. Supp. 2d at 331 (court ordered the defendant to pay a civil penalty because he
7   deprived investors of $443,962.10 and diverted $185,000 for his personal use); *SEC v. Freeman*,
8   290 F. Supp. 2d 401, 405 (S.D.N.Y. 2003) (holding the SEC was entitled to a civil penalty
9   because defendant made eight trades on insider information over the course of two years).

Weighing against factors which support a civil penalty is Defendant's current financial situation, as he has disgorged most, if not all, of the money that he made from the illegal trades. *See* Docket No. 161, Defendant's Exh. A (Defendant's 2007 Income Tax Return). After taxes, Defendant, if anything, is in the red. Further, Defendant has already been subjected to a criminal conviction and forfeiture in the amount of $396,941, agreed to an injunction against future securities laws violations, and paid criminal restitution for $738,539.42. *See* Mot. at 20; Opp. at 5. The Court finds that payment of disgorgement and prejudgment interest combined with these criminal penalties and his resulting financial situation will sufficiently deter Defendant from committing future securities laws violations, therefore making the payment of civil penalties excessive and unnecessary. Moreover, Defendant is enjoined from future securities laws violations. *See also* Docket No. 161, Defendant's Exh. A (Defendant's 2007 Income Tax Return). Thus, civil penalties are not warranted.

### IV.   CONCLUSION

The Court **GRANTS** the SEC's motion for summary judgment on Defendant's civil liability for securities fraud. The Court will issue a permanent injunction enjoining Defendant from future violations of securities laws, which both parties agree is appropriate. The Court further finds that Defendant must pay disgorgement in the amount of $424,988 and prejudgment interest for the period discussed above. The SEC shall file a supplemental brief within seven (7) days with calculation of prejudgment interest. Defendant shall have seven (7) days thereafter to

contest such calculation. The Court **DENIES** the SEC's request for civil penalties.

This order disposes of Docket No. 152.

**IT IS SO ORDERED**.

Dated: March 1, 2016

_____
EDWARD M. CHEN
United States District Judge